John R. WALSH, Jr., Petitioner,

v.

**DISTRICT OF COLUMBIA POLICE AND FIREFIGHTERS RETIREMENT AND RELIEF BOARD, Respondent.**

No. 86–656.

District of Columbia Court of Appeals.

Argued Feb. 20, 1987.
Decided April 3, 1987.

Robert Cadeaux, with whom Frederic W. Schwartz, Jr., Washington, D.C., was on the brief, for petitioner.

Charlotte Brookins-Pruitt, Asst. Corp. Counsel, with whom James R. Murphy, Acting Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Before PRYOR, Chief Judge, and NEBEKER and ROGERS, Associate Judges.

PRYOR, Chief Judge:

Petitioner John R. Walsh, Jr., a twenty-two year officer with the District of Columbia Metropolitan Police Department, seeks review of a decision of the Police and Firefighters Retirement and Relief Board's (Board) finding that he is not disabled for useful and efficient service in the grade or class of position he last occupied. After a hearing on February 27, 1986, the Board, on April 8, 1986, concluded that while Mr. Walsh was partially disabled as a result of a job-related injury, he was still capable of performing limited duty for the police department as he had for some time after the injury, and was therefore ineligible for disability retirement pursuant to D.C.Code §§ 4–607(2), –615(a), and –616(a) (1981). Petitioner claims that the Board's decision is not supported by substantial evidence and is inconsistent with the medical testimony presented. We conclude that the Board's decision is not supported by substantial evidence and remand for further proceedings.

## I

Petitioner was appointed to the Metropolitan Police Department on February 2, 1963. The injury pertinent to this litigation occurred on June 4, 1975, when petitioner severely sprained his right shoulder as he attempted to conduct an arrest. As a result of this injury, he was placed on sick leave from June 6, 1975, until July 29, 1975, when he returned to regular duty. In October 1975, he complained of pain to his right shoulder and went on sick leave from October 16, 1975, until November 12, 1975, then again from December 11, 1975, to January 7, 1976. His treating physician diagnosed his condition as an inflammation of the tendons in the shoulder, bicipital tendonitis, but anticipated no permanent disability at that time.

On April 17, 1984, Mr. Walsh reported to the Police and Fire Clinic and complained of pain in his right shoulder, although he denied any recent injury. He was again placed on sick leave. He was referred to Dr. Joseph Linehan, an orthopedic surgeon, who diagnosed his condition as chronic bicipital tendonitis, attributable to Mr. Walsh's 1975 injury. Mr. Walsh was placed on anti-inflammatory medication and given cortisone injections until September 1984, when a decision was made to perform surgery on his right shoulder tendons to attempt to correct the condition. Surgery was performed by Dr. Linehan on October 4, 1984. Mr. Walsh was placed on administrative sick leave for seven months while he recuperated and underwent physical therapy. In February 1985, Dr. Linehan recommended that Mr. Walsh be allowed to return to work in a limited duty capacity, so long as he was not required to perform any lifting or to work above his shoulder level.

Mr. Walsh performed limited, light administrative duties from February 11, 1985 until February 27, 1985, when he reported he was experiencing pain and stiffness in his shoulder and neck, as well as headaches. He was again placed on administrative sick leave for intermittent periods during the following months as the problems persisted. Mr. Walsh contined to complain of pain and received physical therapy, anti-inflammatory medication and ultrasound treatments throughout this period. On May 12, 1985, Mr. Walsh went on permanent sick leave.

On August 7, 1985, Mr. Walsh requested to be retired on disability. Mr. Walsh reported an increase in pain, and Dr. Linehan advised the Police and Fire Clinic, in a

letter dated August 17, 1985, that Mr. Walsh's "performance even in a limited duty status has become incapacitating to him." He advised Mr. Walsh to continue using the anti-inflammatory medication, although his letter to the Police and Fire Clinic noted that the drugs did not seem to be helping Mr. Walsh's symptoms significantly. After Mr. Walsh reported an increase in the frequency and severity of his headaches, he was referred for a neurological exam and CAT scan on October 8, 1985. The diagnosis was that Mr. Walsh was suffering from muscle spasms in his head and neck and mild degenerative arthritis of the neck and spine related to the shoulder injury. On November 6, 1985, Mr. Walsh was again seen by Dr. Linehan, who reported that the anti-inflammatory drug was helping some of Mr. Walsh's symptoms "quite a bit," although he was still suffering discomfort in his shoulder.

At the outset of the hearing before the Board on February 27, 1986, the report of the Board of Police and Fire Surgeons was incorporated into the record. The report diagnosed Mr. Walsh as suffering from tendonitis of the right shoulder, post-operative tendoritis of the same shoulder, arthritis of the spine and headaches. It concluded that Mr. Walsh suffered a 10% functional impairment of the use of his right shoulder, but made no recommendation as to whether Mr. Walsh should be retired from service.

The first witness at the hearing was Detective Richard Hamilton, who had worked in the same office as Mr. Walsh during those periods in 1985 when Mr. Walsh was on limited duty status. Detective Hamilton described Walsh as being "miserably in pain" or "in some pain" consistently, and that he was "shying away" from contact with others because it aggravated his pain.

Hamilton testified that he believed Walsh's injury was genuine.

The next witness was Dr. Toshi Tsurumaki, a member of the Board of Police and Fire Surgeons who helped prepare the summary medical report to the Retirement Board. Dr. Tsurumaki testified that he agreed with the August 17, 1985 opinion of the treating physician, Dr. Joseph Linehan, that Mr. Walsh's condition was incapacitating and precluded him from performing any kind of limited duty at that time. Dr. Tsurumaki stated that he agreed with this assessment because "we did try to improve him and he did not improve. As a matter of fact, the pain was getting worse and worse." As for Mr. Walsh's present condition, Dr. Tsurumaki testified that his pain and suffering continued on a constant basis, and that any movement at work would aggravate his symptoms. The Doctor stressed that Mr. Walsh's symptomatic pain was disabling in itself, and rendered him unable to perform limited duties, even though his actual physical mobility remained relatively normal.

On examination by the Board, the Doctor repeated several times his opinion that Mr. Walsh's disability from pain was so severe that Mr. Walsh could not function in limited duty, despite his retention of most of his physical mobility.[1] When questioned how Mr. Walsh's treatment was progressing in the months immediately preceding the hearing,[2] the Doctor noted that Dr. Linehan's report of November 15, 1985 showed that an analgesic medication, Feldene, had helped Mr. Walsh's treatment "quite a bit," but Tsurumaki indicated that "otherwise [Mr. Walsh] was status quo." Asked to expand on the impact of Feldene, Dr. Tsurumaki testified that Mr. Walsh had been taking Feldene for an extended period of time during the course of his treatment, but at no point did he indicate to him that

---

1. Dr. Tsurumaki testified: "It is true that he does have some movement in the right shoulder but any movement that is associated with the pain becomes a trigger for the onset of more severe pains and in that sense then he is disabled from performing limited duties." He later stated that even if no movement were required in a job setting, Mr. Walsh "cannot even

sit in an office for a certain period of time" without experiencing great pain.

2. Mr. Walsh saw Dr. Linehan at least once more during the interim from November 15, 1985 to the date of the hearing. The Board did not have before it (and the record on appeal does not indicate) the results of this consultation.

he felt better as a result of taking this drug. The Doctor indicated: "the only thing written [on petitioner's medical report] is he [is] persistently, continuously still suffering from the right shoulder pain and neck pain and pain in the back of his head."

The last witness was petitioner, who testified that he continued to suffer from pain and stiffness in his shoulder and neck, as well as severe headaches, which he tries to relieve by napping and taking several hot showers a day. Walsh testified that these symptoms force him to remain home and inactive most of the time. He also testified that he did not receive a great amount of relief from the use of Feldene, but that it provided some relief from pain as compared with not taking it at all.

## II

In its April 8, 1986 findings, the Board indicated that it was not persuaded that petitioner's 10% functional limitation renders him incapable of performing useful and efficient service for the District of Columbia, and that his pain can be brought "under fair control with the use of prescribed medication." The Board also found petitioner's credibility to be "questionable when viewed in light of his testimony concerning the use of his left hand." Based on these perceived inconsistencies, the Board found that "petitioner's inability to use his 90% residual functional capability is not due entirely to severe pain in his right shoulder, but rather to petitioner's unwillingness to make a good faith effort to try and rehabilitate himself."

The Board found that although petitioner has taken sick leave on numerous occasions, it "does not necessarily indicate in all cases that petitioner is physically incapacitated, but rather that petitioner took advantage of his sick leave status." The Board concluded, based on petitioner's 90% residual functional capacity, that he was still able to perform useful and efficient limited duty with the Metropolitan Police.

## III

An agency's findings of fact are "conclusive on this court unless unsupported by substantial evidence in the record." *Proulx v. Police and Firemen's Retirement and Relief Board*, 430 A.2d 34, 35 (D.C.1981); *Liberty v. Police and Firemen's Retirement and Relief Board, et al.*, 410 A.2d 191, 192 (D.C.1979); *see* D.C. Code § 1–1510 (1981). Substantial evidence is " 'more than a mere scintilla,' " it is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Proulx, supra*, 430 A.2d at 34–35; *Liberty, supra*, 410 A.2d at 192, quoting *Jameson's Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Board*, 384 A.2d 412, 418 (D.C. 1978) (citations omitted). This court must review the record as a whole to determine whether the agency could fairly and reasonably find the facts as it did, and to assure that the Board's decision did not rely on unsupported findings. *Proulx, supra*, 430 A.2d at 35; *Liberty, supra*, 410 A.2d at 193.

■ The question before the Board was whether Mr. Walsh was "disabled for useful and efficient service in the grade or class last occupied." D.C.Code § 4–607(2) (1981). We have interpreted § 4–607(2) to mean that an officer is "disabled" if he is unable to perform work in any position at the same salary level as he previously earned. *Wells v. Police and Firefighter's Retirement and Relief Board*, 459 A.2d 136, 138 (D.C.1983) (en banc); *Seabolt v. Police and Firemen's Retirement and Relief Board*, 413 A.2d 908, 910–12 (D.C. 1980). Specifically, the Board was confronted with the issue of whether Mr. Walsh could perform the limited duties to which he was assigned after his injury.

■ "[P]etitioner bears the burden of showing that there is no job available which he can perform in the grade or class of position he last occupied in the Department." *Wells, supra*, 459 A.2d at 139; *Seabolt, supra*, 413 A.2d at 912. "A petitioner will be able to show that no appropriate job is available if the Department fails to place and keep him employed in such a job." *Wells, supra*, 459 A.2d at 139; *Woody v. Police and Firemen's Retire-*

*ment and Relief Board,* 441 A.2d 987, 989 (D.C.1982). Here we conclude that petitioner has met his burden through the medical evidence and testimony presented at the hearing, as well as his continuous absence from work on administrative sick leave, with the approval of the Board of Police and Fire Surgeons, for the eight months previous to the hearing. No evidence in the record was offered to indicate that anyone in the Department asked Mr. Walsh to come back to work during this period, or that anyone in the Department believed that Mr. Walsh's complaints were not genuine.

■ We also conclude that the Board's findings that Mr. Walsh "took advantage" of his sick leave status, and that his absence from work was motivated by a lack of good faith motivation to rehabilitate himself are unsupported by substantial evidence. The Board's only evidentiary bases for these conclusions are the statement of Dr. Linehan that the analgesic compound Feldene had helped Mr. Walsh "quite a bit," and the Board's adverse credibility determination regarding petitioner's testimony about the use of his left arm.

Based on Dr. Linehan's report of November 15, 1985 that the Feldene had helped petitioner "quite a bit," the Board concluded that Mr. Walsh's headaches and pain could be sufficiently controlled with Feldene and other analgesics. While Dr. Tsurumaki concluded that the compound provided some relief to petitioner, his opinion was nonetheless clear that petitioner was no longer able to perform limited duty, since petitioner "cannot even sit in an office for a certain period of time" without experiencing great pain. Additionally, petitioner himself clearly explained that the Feldene was of some use to him, but that he was still unable to function normally as a result of his pain.

■ The Board also concludes that Mr. Walsh's testimony concerning the use of his injured right arm and of his left arm is inconsistent and shows that he is not motivated to attempt to rehabilitate himself and return to work. The statements at issue refer to two different types of activity which petitioner attempts to engage in with his injured right arm.[3] While the Board may use its personal observations of a petitioner as a basis for making credibility determinations, *see Proulx, supra,* 430 A.2d at 35–36 (Board relied on personal observations, medical testimony, films of claimant, and claimant's statements to others, which all indicated that he could perform greater duties than he claimed were possible), the testimonial evidence relied on here to make this determination does not rise to the level of substantial evidence, even if the purported inconsistencies are assumed to exist. Without intruding into the Board's role of deciding credibility, it seems clear that the overwhelming weight of medical evidence and testimony presented at the hearing indicates that petitioner is no longer fit for limited duty service.

Therefore, in view of the medical evidence and testimony presented, and the lack of evidentiary support for the Board's rejection of this evidence, we conclude that its finding that petitioner remains fit for limited duty service is unsupported by substantial evidence. *See Arellano v. District of Columbia Police and Firemen's Retirement and Relief Board,* 384 A.2d 29, 31 (D.C.1978). The Board's order is therefore

---

**3.** The Board asked Mr. Walsh if he could shave, comb his hair, and perform other similar tasks with his left arm. He replied that he does not since he is right handed, but that the necessary use of his right hand and arm causes a great deal of pain. Walsh indicated that it was dangerous, for example, to shave with his left hand, particularly around areas such as the neck. The Board then asked Walsh if he encountered problems in driving, and Walsh replied: "I don't drive that often.... I drive with my left hand.... Everything I do now I try to do more left-handed where normally I used to drive with, you know, [my] right hand." The Board found these latter statements to be inconsistent with the former, and represented evidence of a lack of good faith motivation to use the 90% residual capacity of his right arm. The Board's finding ignores, however, that the types of activity involved in the two statements, shaving and driving, require different levels of dexterity and coordination, one generally requiring the use of the dominant hand, while the other generally does not.

vacated, and the case remanded for further proceedings consistent with this opinion.[4]

*Reversed and remanded for further proceedings consistent with this opinion.*

---

**4.** Our role terminates with a reversal and remand; it remains for the Board to reapply itself to the case. *Arellano, supra* at 31 n. 1; *Stoner v.* *District of Columbia Police and Firemen's Retirement and Relief Board,* 368 A.2d 524, 531 n. 12 (D.C.1977).