Matthew J. BAUMGARTNER,
Petitioner,

v.

POLICE AND FIREMEN'S RETIRE-
MENT AND RELIEF BOARD,
Respondent.

No. 86–1002.

District of Columbia Court of Appeals.

Argued April 3, 1987.

Decided June 11, 1987.

Robert E. Deso, Washington, D.C., for petitioner.

Charlotte Brookins-Pruitt, Asst. Corp. Counsel, with whom James R. Murphy, Acting Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Before NEWMAN, TERRY, and ROGERS, Associate Judges.

TERRY, Associate Judge:

Petitioner, a Metropolitan Police sergeant seeking retirement on disability, asks us to review a ruling by the Police and Firemen's Retirement and Relief Board that his disabling knee injury was not incurred in the performance of duty. *See* D.C. Code § 4–615(a) (1981). He does not dispute the Board's finding of permanent disability. Rather, he claims that his disability resulted from an on-duty injury, and that the Board's decision to the contrary is not supported by substantial evidence. We agree and reverse.

I

On September 26, 1976, petitioner Baumgartner injured his right knee when he jumped from the top of a five-foot wall to retrieve a football. At the time of the injury, Baumgartner was a twenty-year-old police cadet, but the injury was unrelated to his official duties. He went to an orthopedic clinic the next day, where he was informed that he had sprained his knee. One of the doctors who examined him was Dr. William Hanff, who "rule[d] out" the possibility that the knee had any "internal derangement."[1] A second doctor, Marion

---

1. At the hearing before the Board, Dr. Lawrence

Manning, a member of the Board of Police and

Restivo, suspected internal derangement, but an x-ray could neither confirm nor dispel his suspicion.

At a follow-up examination three days later, Dr. Hanff noted that Baumgartner was "still complaining of pain." Revising his earlier diagnosis, Dr. Hanff decided that there probably was some internal derangement of the knee. During the next two months Dr. Hanff examined Baumgartner four more times. On November 18, the date of his last examination, Dr. Hanff found the knee to be "asymptomatic," with "just a minimal amount of instability ... on the medial side."

In 1977, after completing his cadet training, Baumgartner applied for appointment as a Metropolitan Police officer. The police department, concerned about any lingering aftereffects of the 1976 injury, appointed a special panel of three doctors to examine his knee and assess its condition. Although an x-ray revealed a slightly abnormal amount of fluid inside the knee, the panel concluded:

> After history and examination, completely normal function apparently prevails. There is no history of crude significant physical impairment of this patient's knee. Recommendation is that kneewise, patient is [an] acceptable cadet.

Accordingly, Baumgartner was appointed to the police force on May 8, 1977.

For over five years Baumgartner had no further problems with his knee. Then, on September 2, 1982, while investigating a reported assault, Baumgartner jumped off a five-foot fence into the yard where the assault was taking place. When he landed, he immediately felt a severe pain in his right knee, which immobilized him on the spot. After being treated at the Washington Hospital Center, he went back to Dr. Hanff, who diagnosed the injury as "torn ligaments and possibly torn cartilage ... pending further examination after the swelling subsides."

Dr. Stephen Gunther, Chief of Orthopedics at the Washington Hospital Center,

examined Baumgartner's knee on September 20, 1982. The doctor's impression was that the knee had internal derangement as well as a "possible old cruciate ligament injury." He also noted that there was "already ... some atrophy in the thigh." However, since the condition of the knee was "definitely improving," Dr. Gunther felt that surgery was unnecessary. He recommended instead a program of leg exercises, with the expectation that Baumgartner might be able to return to light duty after about three weeks.

The rehabilitative efforts, unfortunately, proved to be fruitless, and Dr. Gunther operated on the knee on November 23, 1982. The operation revealed that the anterior cruciate ligament had been torn. Dr. Gunther also found "some evidence of old hemorrhage as well as new hemorrhage" in the area of the ligament. Baumgartner returned to the police force in January 1983 and was assigned to limited duty.

Six months later, on July 14, Baumgartner injured his right leg when he accidentally stepped through a broken sewer grate. This injury, which did not occur in the line of duty, resulted in Baumgartner's taking forty-six hours of sick leave. Baumgartner testified before the Board, however, that this incident did not reinjure his right knee, and that he only suffered abrasions on his shin and thigh.

The final trauma to the knee occurred on September 14, 1983, while Baumgartner was on limited duty with the Court Liaison Division. As he stepped aside from someone who was about to open a door in front of him, his knee twisted, and he lost his balance and fell. This on-duty injury required him to take forty-three hours of sick leave.

After Baumgartner returned to limited duty, the condition of his knee grew worse. Since all rehabilitative efforts had failed, Dr. Gunther referred Baumgartner to Dr. Stephen Haas, an experienced knee surgeon. Dr. Haas operated on Baumgart-

Fire Surgeons, testified that "internal derangement" occurs when some of the tissue within

the knee, such as the cartilage, is damaged.

ner's knee in March 1984 in an attempt to reconstruct the damaged ligament.

Baumgartner went back to work in May 1984, still on limited duty, and also started a therapy program. The knee did not respond to the therapy but continued to deteriorate, until he had to receive cortisone injections to ease the pain. Dr. Haas also provided Baumgartner with a knee brace. Baumgartner underwent a third operation in October 1985, but the condition of his knee failed to improve. In a letter to the Police and Fire Clinic dated December 17, 1985, Dr. Haas stated that the knee was seventy-five percent impaired, and that the disability was permanent.

In April 1986 the Board of Police and Fire Surgeons examined Baumgartner and reviewed his medical history. The Board of Surgeons concluded that Baumgartner was "permanently disabled with a functional impairment of 20%."

In May 1986 the Police and Firemen's Retirement and Relief Board held a hearing to determine Baumgartner's eligibility for disability retirement. At the hearing Baumgartner's medical records were placed in evidence, but the only witnesses were Dr. Lawrence Manning, a member of the Board of Police and Fire Surgeons, and Baumgartner himself; none of his treating physicians—Dr. Hanff, Dr. Gunther, or Dr. Haas—was called to testify. The Retirement Board found that Baumgartner was permanently disabled, agreeing with the earlier finding of the Board of Surgeons. The Retirement Board further found, however, that the disability stemmed from the off-duty 1976 accident, so that Baumgartner was entitled only to disability benefits under D.C.Code § 4–615(a) (1981), instead of the more generous provisions of D.C. Code § 4–616(a) (1981).[2] Baumgartner now seeks review of that decision.

---

**2.** D.C.Code § 4–616(a) applies only if an officer suffers an injury "in the performance of duty or such injury ... is aggravated by such duty at any time after appointment and such injury ... or aggravation permanently disables [the officer] for the performance of duty...." The Board concluded that since Baumgartner's disability resulted from the on-duty aggravation of his off-duty injury in 1976, he was not entitled to receive a pension under section 4–616(a).

## II

The issue before the Retirement Board was whether Baumgartner's on-duty injury in 1982 and the subsequent aggravations caused his permanent disability, which would entitle him to retire under D.C.Code § 4–616(a), or whether his off-duty 1976 injury was the root cause of all his knee problems, which would give him a reduced pension under D.C.Code § 4–615(a). A claimant seeking benefits under section 4–616(a) bears the initial burden of producing evidence that the disabling injury was incurred in the performance of duty. If the claimant "makes a showing of a service incurred injury, the opposing side must then offer evidence disproving the logical inference that the ensuing disability was the long term result of such injury." *Johnson v. Board of Appeals & Review,* 282 A.2d 566, 570 (D.C.1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1175, 31 L.Ed.2d 232 (1972); *accord, Arellano v. District of Columbia Police & Firemen's Retirement & Relief Board,* 384 A.2d 29, 30 (D.C.1978).[3] In other words, once the claimant makes a showing of a disabling on-duty injury, the burden shifts to the government, which must then rebut this "logical inference" with "substantial evidence ... disprov[ing] the inference of causation by an on-duty injury...." *Id.* If the government's proof is deficient, the claimant is entitled under *Johnson* and *Arellano* to rely on the "logical inference" that his or her disability was the result of the proven on-duty injury.

Baumgartner certainly met his initial burden of production at the hearing before the Board. It was undisputed that his on-duty injury in 1982 eventually led to his permanent disability. The only real question was whether the 1976 injury also contributed to the disability; if so, then the

---

See *Kirkwood v. District of Columbia Police & Firemen's Retirement & Relief Board,* 468 A.2d 965, 969 (D.C.1983).

**3.** *Arellano* involved D.C.Code § 4–527(1) (1977 Supp.), which has been recodified as D.C.Code § 4–616(a) (1981) with an amendment that does not affect our holding here.

1982 injury was merely an aggravation of an off-duty injury. Hence it was incumbent on the government to present substantial evidence to rebut Baumgartner's claim and to support the Board's conclusion that the 1976 injury was the ultimate cause of his disability.[4]

■ "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938) (citations omitted); *accord, e.g., Proulx v. Police & Firemen's Retirement & Relief Board,* 430 A.2d 34, 35–36 (D.C.1981). If this court, upon examining the record as a whole,[5] concludes that the Board's findings are supported by substantial evidence, it must accept those findings, even though there may also be substantial evidence in the record to support a contrary finding. *Upper Georgia Avenue Planning Committee v. Alcoholic Beverage Control Board,* 500 A.2d 987, 992 (D.C. 1985) (citing cases); *see Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966); *NLRB v. Nevada Consolidated Copper Corp.,* 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305 (1942). On the other hand, we will not hesitate to reverse a Board decision that is not based on substantial evidence. *Walsh v. District of Columbia Police & Firefighters Retirement & Relief Board,* 523 A.2d 562, 566–567 (D.C.1987); *Arellano, supra,* 384 A.2d at 31.

■ In this case we hold that the Board's decision is not supported by substantial evidence. The Board's order relies on various shreds of evidence that are simply too weak to sustain it. First, the Board drew strong inferences from the fact that Baumgartner was examined by a special panel of doctors before he was accepted into the police department. The Board found this "noteworthy because it underscore[d] the significance" of the 1976 injury, remarking also that the panel never specifically concluded that his knee had fully recovered from that injury.

The Board's analysis of this evidence is too strained to survive appellate review. Although the special panel was appointed because of a concern about the condition of Baumgartner's knee, the knee fully passed muster with the panel; "knee-wise," the panel said, Baumgartner was an "acceptable" candidate for appointment. The panel noted that "completely normal function apparently prevails." Furthermore, we see no significance in the panel's failure to conclude that the knee had fully recovered, for that was not its assigned task; the panel was asked only to determine whether Baumgartner could function as a police officer, not whether his knee was still suffering any effects from the 1976 injury.

Second, the Board focused on the similarities between the 1976 and 1982 injuries. It is true that the origin, symptoms, and later treatment of these two injuries were somewhat similar. But those similarities are of no importance. The relevant question is whether Baumgartner's knee fully recovered after the 1976 accident and therefore played no role in his disability. That question is not answered merely by

---

4. The District cites *Neer v. District of Columbia Police & Firemen's Retirement & Relief Board,* 415 A.2d 523, 526–527 (D.C.1980), for the proposition that Baumgartner bore the burden of proof before the Board, implying that the burden never shifted. *Neer* and earlier cases, however, placed the burden of proof on a claimant because of a code provision that no longer applies to Metropolitan Police officers. D.C.Code § 4–527(2) (1977 Supp.) required a claimant to prove that he or she was disabled from an on-duty injury if the proximate cause of the disability was uncertain. *See Morgan v. District of Columbia Police & Firemen's Retirement & Relief Board,* 370 A.2d 1322, 1325 n. 4 (D.C. 1977); *Lewis v. District of Columbia Board of*

*Appeals & Review,* 330 A.2d 253, 255 (D.C.1974). But this section was amended in 1979 to exclude Metropolitan Police officers from its coverage. Pub.L. No. 96–122, § 204, 93 Stat. 866, 902–903 (1979). It now applies only to members of the United States Park Police, the Executive Protective Service, and the United States Secret Service. D.C.Code § 4–616(b) (1981). Thus *Neer* is not applicable to this case, and the District's reliance on it is misplaced.

5. *See, e.g., Kirkwood v. District of Columbia Police & Firemen's Retirement & Relief Board, supra* note 2, 468 A.2d at 967.

comparing the two injuries and the treatment he received for them.

Finally, the Board's order relied on "the medical evidence," particularly Dr. Gunther's conclusion when he examined Baumgartner on September 20, 1982, after his injury on September 2, that there was a "possible old cruciate ligament injury." This evidence, viewed in the context of the whole record, cannot support the Board's decision. Dr. Gunther did not testify before the Board; the interpretation of the quoted language in his clinical note was left to Dr. Manning, who had no direct knowledge of what it meant. Dr. Manning conceded that the "possible old" injury might have referred to either the 1976 or the 1982 trauma. As Dr. Manning explained, some knee specialists consider an injury that occurred three weeks ago as "old," and Baumgartner had not seen Dr. Gunther until almost three weeks after the September 2 injury. Moreover, Dr. Gunther's note itself stated only that Baumgartner had a "possible" old injury, which is hardly a clear diagnosis. We conclude that Dr. Manning's interpretation of Dr. Gunther's clinical note, which was ambiguous to begin with, was of no evidentiary value.

Dr. Gunther also found that Baumgartner's thigh had "already" begun to atrophy when he examined it in September 1982. From this comment the Board inferred that Baumgartner's knee "had suffered an appreciable amount of damage prior to the September 1982 injury, and that the knee had been weakened by the older injury." This inference is entirely unwarranted. Read in context, Dr. Gunther's statement almost certainly meant that Baumgartner's thigh was atrophying as a result of the 1982 injury. It is highly unlikely that Dr. Gunther would say that the thigh had "already" started to atrophy from an injury that occurred six years earlier. Moreover, the uncontradicted evidence showed that Baumgartner had the full use of his knee until he injured it in September 1982, so

that there would be little or no sign of atrophy before 1982.

When Dr. Gunther operated on the knee on November 23, 1982, he found "some evidence of old hemorrhage as well as new hemorrhage." The Board concluded that the "old hemorrhage"—as well as the signs of atrophy—was tantamount to an anatomical smoking gun, indicating that the underlying problem with the knee stemmed from the 1976 injury. But Dr. Gunther was never called to testify what he meant by "old," and Dr. Manning said that an "old" hemorrhage might be only a few weeks old; any hemorrhage resulting from the 1976 injury, on the other hand, would have been absorbed by the body. Accordingly, the "evidence of old hemorrhage" provides no support for the Board's decision.

Dr. Manning's testimony was the only evidence before the Board that unequivocally addressed the issue of whether Baumgartner's knee had fully recovered from the 1976 injury before it was injured again in 1982. Dr. Manning not only found it difficult to connect the two injuries, but said that the knee was normal and fully functional at the time Baumgartner entered the police department in 1977. Under questioning from the Board, Dr. Manning said he could not "assume," after reviewing the medical records, that the 1976 injury "could predispose [Baumgartner's] knee to a weakening situation that would be aggravated by any subsequent injury...." [6]

In light of the extremely flimsy evidence relied upon by the Board, as well as the uncontradicted testimony of Dr. Manning, we hold that the Board's decision was not supported by substantial evidence. We therefore reverse the order under review, as we did in *Walsh* and *Arellano, supra,* and remand this case to the Board for further proceedings consistent with this opinion.

*Reversed and remanded.*

---

**6.** Although Dr. Manning testified that if a cruciate ligament is in fact ruptured, the knee would then be weaker and more susceptible to injury, he did not state that this had happened to Baumgartner's knee.