**Stephen LAMPHIER, Petitioner,**

v.

**DISTRICT OF COLUMBIA POLICE AND FIREFIGHTERS' RETIREMENT AND RELIEF BOARD, Respondent.**

No. 95–AA–1425.

District of Columbia Court of Appeals.

Submitted June 2, 1997.

Decided Aug. 14, 1997.

James Taglieri and Frederic W. Schwartz, Jr., Washington, DC, filed a brief for petitioner.

Jo Anne Robinson, Acting Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Sheila Kaplan, Assistant Corporation Counsel, filed a brief for respondent.

Before SCHWELB and FARRELL, Associate Judges, and GALLAGHER, Senior Judge.

SCHWELB, Associate Judge.

Battalion Chief Stephen P. Lamphier of the District of Columbia Fire Department (DCFD) has asked this court to review a decision of the District of Columbia Police and Firefighters' Retirement and Relief Board (the Board) denying his claim for benefits at the special pension rate available to a member who has been forced to retire on account of a service-related injury. *See* D.C.Code § 4–616 (1994). It is undisputed that Chief Lamphier is permanently disabled with a functional impairment of 10%, but the Board found no substantial evidence that any of several work-related injuries caused his condition. Chief Lamphier contends that the Board's decision is not supported by substantial evidence in the record as a whole and that the Board applied an incorrect legal standard. We agree and reverse.

## I.

### THE FACTS

On June 22, 1995, the Board conducted an evidentiary hearing and heard testimony from Chief Lamphier and from Alexander Ukoh, M.D., a member of the Board of Surgeons of the Police and Fire Clinic. The testimony of these two witnesses was uncontradicted and was supplemented by medical records as summarized below.

### A. *Chief Lamphier's injuries.*

Chief Lamphier, who is fifty-five years old, joined the DCFD in 1964, at the age of 22. He was subsequently promoted to Battalion Chief. At the time of the hearing before the Board, he had served as a firefighter for more than thirty years. The record discloses that during his long career, Chief Lamphier suffered several work-related injuries to his neck. We outline them in chronological order.

On September 23, 1971, while Chief Lamphier was on duty, the springs of the door of a fire truck malfunctioned and struck Lamphier on the head, knocking him unconscious. When he regained consciousness at the hospital, medical personnel told him that they suspected that his neck was broken. Lamphier was immobilized, placed in a neck brace, and tied to the bed. Although it was subsequently ascertained that Chief Lamphier's neck was not broken, he continued to report soreness for some time. Chief Lamphier remained in the hospital for two nights, but he was released after he had been examined by a neurosurgeon. He missed one week of work.

On June 27, 1985, Chief Lamphier was on duty when a ceiling collapsed on him. He suffered injuries to his neck and shoulders. He was placed on sick leave, and resumed duty one week later, on July 4, 1985.

On April 2, 1993, Chief Lamphier fell while on duty. He injured his neck and right shoulder. He was treated and placed on sick leave. He returned to light duty on May 3, 1993, and to full duty six days later.

On April 11, 1994, Chief Lamphier was injured when he fell down an unlighted staircase while responding to a call. He aggravated his neck condition and injured his right shoulder. He has been unable to return to work since this incident.[1]

Chief Lamphier also suffered serious injuries in an off-duty automobile accident which occurred on November 10, 1979. Although the Board was hampered in the evaluation of

1. There is some contradiction in the somewhat skimpy record as to whether Lamphier's fall on a staircase occurred in April 1993 or April 1994. It is undisputed, however, that both of these accidents happened on duty.

this incident by the unavailability of some relevant records, it appears that Chief Lamphier suffered a fractured skull, a cerebral concussion, and possible intra-cranial bleeding. As a result of this accident, Chief Lamphier was on sick leave for two months and five days, and subsequently on light-duty for some undisclosed additional period of time.

### B. *The medical testimony.*

Dr. Ukoh testified that Chief Lamphier suffers from degenerative disc disease, an arthritic condition. He explained that there are three categories of arthritis:

1. familial or inherited arthritis;
2. arthritis incurred solely through the aging process; and
3. arthritis resulting from trauma.

According to Dr. Ukoh, Chief Lamphier's arthritis was not inherited or familial for, if it had been, "he would have had it at a younger age." Turning to the second category, Dr. Ukoh stated: "I cannot tell you for sure that what you find in his neck [is] a result of his age." In spite of the indefiniteness of this assessment, Dr. Ukoh then stated, in response to a question from a member of the Board, that "I will have to put it on trauma." He explained that "[i]n the presence of trauma to the particular region, and you find this degeneration subsequently, I have to tie it into the trauma more than normal." Asked whether "daily wear and tear" was a factor, Dr. Ukoh responded:

I wouldn't lump everything all together. I wouldn't lump normal daily wear and tear along with the known significant injuries to the area that I have [mentioned]. *I would*

*restrict everything to the injuries and not to normal, daily wear and tear.*

(Emphasis added.) [2]

Dr. Ukoh testified that Chief Lamphier's condition resulted from the "cumulative" injuries to his neck. He stated that "[i]t's difficult to pinpoint the '71, '79, or '85, or '87 [sic].[3] I would say it's a combination of all of them." He explained, however, that Chief Lamphier's initial 1971 head injury was significant enough to have implicated the neck at that time. Asked by Chief Lamphier's counsel to identify the injury that "started the ball rolling," Dr. Ukoh responded: "From what I see on the record now, the first initial injury that is related to the neck was the '71 injury. The first initial one."

Dr. Ukoh made it clear that, in his opinion, Chief Lamphier's condition was not initially brought about by Lamphier's fall in April 1994. He so concluded because the bulge in the disc represented "degenerative changes that occurred over the years. It doesn't happen acutely, as we all know." When Dr. Ukoh was asked whether the incident in June 1985 (when a ceiling fell on Chief Lamphier) was a "pre-existing cause of those x-ray findings," Dr. Ukoh responded that "it is reasonable to expect that the injury of January 1985 [4] and the injury of June 1985 would lead to the development of what you're seeing at this time."

Dr. Ukoh was also questioned about Chief Lamphier's 1979 off-duty automobile accident. He testified that he did not have all "of the records and facts about the '79 injury" and that it was difficult for him to compare the consequences of that accident with Chief Lamphier's 1971 incident. Dr. Ukoh

---

**2.** At one point in his testimony, following the discussion of a hypothetical case, Dr. Ukoh was asked whether he still wanted "to go back to the 1971 injury as being the event that set into process...." Dr. Ukoh responded:

I'm not saying that the 1971 injury by itself alone was the cause of the arthritis or *the accumulative injury to the neck would be responsible for the findings that we're seeing now.*

(Emphasis added.) He was then asked: "And you can't ascribe any more significance to one [injury] than to the other? Or can you?" Dr. Ukoh answered, "No."

At first blush, it appears that the language italicized above was contrary to Dr. Ukoh's basic

explanation of Chief Lamphier's condition. It is apparent from the ensuing question and from Dr. Ukoh's testimony taken as a whole, however, that the witness found it impossible to compare the roles of the different traumas in bringing about his condition.

**3.** Dr. Ukoh apparently misspoke. In 1987, Chief Lamphier suffered an injury to his wrist, but not to his neck.

**4.** Once again, Dr. Ukoh appears to have misspoken. In January 1985, Chief Lamphier slipped on ice while on duty and injured his left knee and left hip. There was no reported injury to his neck at that time.

was of the opinion that, both in 1971 and in 1979, the trauma to Chief Lamphier's head implicated his neck as well. He believed that the 1979 incident and the other traumas suffered by Chief Lamphier "were all combined to play a role" in the patient's condition. Dr. Ukoh noted, however, that following the 1971 fire truck incident, Chief Lamphier had subjective complaints regarding his neck, whereas after the 1979 car accident, he had none.[5]

## II.

### THE BOARD'S DECISION

On September 26, 1995, the Board issued a written order disposing of Chief Lamphier's

claim. The Board found that Chief Lamphier is "permanently disabled as a result of cervical disc disease ... that precludes Member from performing useful and efficient service in any duty status." The Board noted Dr. Ukoh's testimony that Chief Lamphier had weakness in his right arm and constant pain radiating down that arm.

The Board then turned to the question whether Chief Lamphier's condition was service-related. After a somewhat selective recitation of the facts,[6] the Board found, in pertinent part, as follows:

In Dr. Ukoh's opinion all of the incidents play a "role" in the problems in Member's

---

5. A public member of the Board noted that Chief Lamphier lost approximately one week of work after the 1971 incident but more than two months after the 1979 car accident. He suggested that Chief Lamphier's injuries must have been more serious on the later occasion. Dr. Ukoh pointed out, however, that the 1979 injuries which took a long time to heal, including "intra-abdominal injury" and some rib fractures, were unrelated to Chief Lamphier's neck.

Dr. Ukoh also testified that "if indeed [Chief Lamphier] did have a skull fracture in '79 ... the force delivered to the head in '79 would be greater than the one in '71." Dr. Ukoh subsequently qualified this answer, however. Chief Lamphier's attorney pointed out that in 1971, Chief Lamphier was wearing a helmet, while in 1979, he was not, and that the helmet could have prevented a skull fracture even if the force of the two blows was the same. Counsel then suggested in a rhetorical "question" that

it could possibly be that he sustained greater trauma to the top of his head or whatever in the '71 incident than in the '79 incident. But we have no way of saying that he did or he didn't or what not, because you can't compare them because he was wearing a helmet.

Dr. Ukoh responded: "No, we have no way of saying it."

6. *E.g.*, the Board did not mention in its findings that in 1971, it was suspected that Chief Lamphier suffered a broken neck, and it failed to describe any of the related circumstances. Similarly, the Board did not disclose Dr. Ukoh's testimony that the 1971 injury "started the ball rolling" towards Lamphier's condition. The Board likewise did not include in its findings Dr. Ukoh's view that Chief Lamphier's condition in 1995 represented something that was "reasonable to expect" on the basis of the June 1985 injury.

The Board found that "[i]t is more normal to see degenerative changes, not associated with trauma, in a person of Member's age." The Board cited specified pages of the transcript to

support this finding, but an examination of those pages reveals that Dr. Ukoh did not so testify. The Board quoted Dr. Ukoh's initial testimony that the trauma to Chief Lamphier's head is likely to have been greater in 1979 than in 1971. The Board made no mention, however, of Dr. Ukoh's substantial qualification of this response later in his testimony. See note 3, *supra*. The Board did not disclose that Chief Lamphier had subjective complaints about his neck in 1971, but not in 1979.

The Board made much of the fact that Chief Lamphier was off duty for far longer after the 1979 automobile accident than he was for his 1971 injury. The Board made no reference, however, to Dr. Ukoh's uncontradicted testimony that this difference between the two incidents, in terms of work time lost, was occasioned by the protracted healing time of 1979 injuries unrelated to Chief Lamphier's neck.

The Board made a number of comments in its Order intimating, without explicitly stating, that Chief Lamphier and his attorney were attempting to deceive the Board. The Board "[found] it curious," for example, "that none of Member's documented neck injuries were disabling or even serious, until he reached retirement age." This intimation that Chief Lamphier was malingering appears to be totally at odds with the Board's own finding that he was in fact permanently disabled.

The Board also stated that "Member's history of reporting his injuries, particularly his off-duty injuries, is not good and thus unreliable. Even the records that Member presented before the Board were altered." The fact that the five relevant accidents occurred, however, is not in dispute. Moreover, Chief Lamphier's case depended almost entirely on Dr. Ukoh's testimony, and it does not appear that the Board's proclaimed suspicions of disingenuity extended to Dr. Ukoh. To the extent that Chief Lamphier's description of his 1971 injury may be at issue, it is worth noting that at the hearing, no attorney or member of the Board questioned his account or cross-examined him on the subject, and no contrary testimony was adduced.

neck, but he cannot point to any one cause or say that Member is disabled because of any particular incident. In fact, the logical conclusion from Dr. Ukoh's testimony is that Member's condition could have started from an incident not in the record; or which predated even the 1971 injury. Dr. Ukoh believes that Member's degeneration is not inherited and is unsure if it is caused by age. Therefore, Dr. Ukoh testified that he "would *have to* put it on trauma" (emphasis added). This is guessing! However, several minutes later, Dr. Ukoh's ambiguity in the support or lack of support for this "guess," surfaces again when he states that,

> I'm not saying that the 1971 injury by itself alone was the cause of the arthritis or the accumulative injury to the neck would be responsible for the findings that we're seeing now.[7]

In the absence of a more definitive medical finding, the Board is unwilling to *place* the cause on trauma. The Board must base its findings on substantial evidence. Neither Dr. Ukoh's testimony, nor the Member's testimony has proven by a substantial weight of the evidence that trauma from an on-duty injury caused member's present degenerative cervical disease.

Finding No. 2 (emphasis in original) (citations to the record omitted). The Board then reasoned as follows in its Conclusions of Law:

> Neither Dr. Ukoh's testimony, nor the Member's testimony has proven by a substantial weight of the evidence [8] that trauma from an on-duty injury caused Member's present discomfort. There are no objective tests, the results of which warrant placing the cause of Member's neck problems on on-duty trauma. Thus, based on the record and the facts in finding two above, the Board finds that Member's disabling condition was not incurred in the performance of duty within the meaning of *D.C.Code § 4-616 (1981).* Therefore, the Board concludes that Member's disability

was incurred other than in the performance of duty, *D.C.Code § 4-615 (1981).* Chief Lamphier filed a timely petition for review.

### III.

### LEGAL DISCUSSION

Paraphrasing *Baumgartner v. Police & Firemen's Retirement & Relief Bd.,* 527 A.2d 313 (D.C.1987), "[t]he issue before the Retirement Board was whether [Chief Lamphier's] on-duty injur[ies] and the subsequent aggravations caused his permanent disability, which would entitle him to retire under D.C.Code Sec. 4-616(a), or whether [aging or] his off-duty [1979] injury was the root cause of all his [arthritic] problems, which would give him a reduced pension under D.C.Code Sec. 4-615(a)." *Id.* at 315. Chief Lamphier contends that the Board's findings are not supported by substantial evidence and that its legal conclusions are erroneous. We agree.

The applicable standard of review is now familiar. Whether Chief Lamphier's arthritic condition is the result of one or more injuries incurred during the performance of duty is an issue of fact. *Croskey v. District of Columbia Police & Firefighters' Retirement & Relief Bd.,* 596 A.2d 988, 990 (D.C. 1991). We may set aside the Board's findings only if they are unsupported by substantial evidence in the record. *See Allen v. District of Columbia Police & Firefighters' Retirement & Relief Bd.,* 528 A.2d 1225, 1229 (D.C.1987). If a finding is supported by substantial evidence, then the court must accept it, even though there may also be substantial evidence in the record to support a contrary finding. *Szewczyk v. District of Columbia Police & Firefighters Retirement & Relief Bd.,* 633 A.2d 1 (D.C.App.1993) (per curiam).

Under the "substantial evidence" standard, the Board must

(1) state findings of fact on each material, contested factual issue, (2) base such find-

---

7. As to this quotation from Dr. Ukoh's testimony, see note 2, *supra.*

8. The Board made no reference to the "shifting burdens" principle developed in our case law. See Part III, *infra.*

ings on substantial evidence, or (3) draw conclusions of law which follow rationally from the findings. Substantial evidence in this context is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "

*Allen, supra,* 528 A.2d at 1229 (citations omitted); *see also DiVincenzo v. District of Columbia Police & Firefighters Retirement & Relief Bd.,* 620 A.2d 868, 872 (D.C.App. 1993). The Board is required to consider all of the evidence and to "make a meaningful attempt to come to grips with the difficult factual issues raised by this record." *DiVincenzo, supra,* 620 A.2d at 872 (citation omitted).

■ The assignment of the burden of proof is also familiar. In a case such as this one, in which Chief Lamphier is claiming that he became disabled as the result of a work-related aggravation of a pre-existing condition, he must show by a preponderance of the evidence that the initial condition was related to the performance of his duties. *See, e.g., Croskey, supra,* 596 A.2d at 991–92 ("[t]he ultimate burden of persuasion remain[s] with [the person claiming entitlement to a special pension rate pursuant to Section 4–616(a) ]"); *Kirkwood v. District of Columbia Police & Firemen's Retirement & Relief Bd.,* 468 A.2d 965, 969 (D.C.1983).

A claimant seeking benefits under section 4–616(a) bears the initial burden of producing evidence that the disabling injury was incurred in the performance of duty. If the claimant makes a showing of a service incurred injury, the opposing side must then offer evidence disproving the logical inference that the ensuing disability was the long term result of such injury. In other words, once the claimant makes a showing of a disabling on-duty injury, the burden shifts to the government, which must then rebut this logical inference with substantial evidence ... disprov[ing] the inference of causation by an on-duty injury.... If the government's proof is defi-

cient, the claimant is entitled to rely on the logical inference that his or her disability was the result of the proven on-duty injury.

*Baumgartner, supra,* 527 A.2d at 315 (footnote, citations, and internal quotation marks omitted).

■ We entertain no doubt that Chief Lamphier satisfied his initial burden. He presented evidence that both the initial injury in 1971 and the final aggravating injury in 1994 were incurred in the performance of duty. Indeed, it is undisputed that Chief Lamphier suffered at least five traumas affecting his neck, of which four occurred while he was on the job. The possibility that all of these traumatic events were unrelated to Chief Lamphier's degenerative disc disease was not a compelling one.

Dr. Ukoh, the sole medical witness who appeared before the Board, testified in substance that although arthritis from aging alone could not be ruled out, Chief Lamphier's condition was probably traumatic in origin. He opined that the 1971 accident, in which a broken neck was initially suspected, the patient's neck had to be immobilized, and subjective complaints of neck pain followed, probably "started the ball rolling."[9] Dr. Ukoh also found a logical association between Chief Lamphier's condition and the Chief's 1985 encounter with a falling ceiling. Unsurprisingly, Dr. Ukoh did not attribute to coincidence Chief Lamphier's development of an arthritic condition in the area of his body affected by several traumatic injuries. *Cf. Poulnot v. District of Columbia,* 608 A.2d 134, 139 (D.C.1992) (coincidences not presumed). Chief Lamphier thus produced evidence which, unless effectively rebutted, established that the disabling injury was incurred in the performance of duty. *See Baumgartner, supra,* 527 A.2d at 315.

■ There was no effective rebuttal to the claimant's *prima facie* case. The Board appeared to attach a great deal of significance

---

9. This testimony was significant. *See Croskey, supra,* 596 A.2d at 989 ("when the duty related injury aggravates a pre-existing non-duty related injury ... a claimant is not entitled to the higher level of benefits"); *Kirkwood, supra,* 468 A.2d at

968–69 (same). The legal situation would therefore be quite different if the off-duty 1979 car accident had been the first occasion on which Chief Lamphier suffered trauma implicating his neck.

to Chief Lamphier's 1979 automobile accident. Indeed, Dr. Ukoh testified that this accident, together with the other traumas to Chief Lamphier's neck, contributed to his disabling condition. There was no testimony before the Board, however, to suggest that the 1979 accident was the sole cause, or even the principal cause, of the Chief's arthritis.

Further, according to the Board, "the logical conclusion from Dr. Ukoh's testimony is that Member's condition could have started from an incident not in the record, or one which predated even the 1971 injury." This assertion is entirely speculative. Although the scenario suggested by the Board is not technically impossible—we cannot know what may or may not have happened to Chief Lamphier, or what might have developed in his body, on occasions not addressed in the record—the only reasonable inference from Dr. Ukoh's testimony is that Chief Lamphier's condition resulted from a combination of traumatic incidents, all but one of which occurred on duty, and that an "on-duty" accident aggravated a condition initially caused by the earlier "on-duty" accident which had set these events in motion. The District government has not presented substantial evidence to the contrary, and we therefore hold that the Board's decision cannot stand.

## IV.

### CONCLUSION

For the foregoing reasons, we conclude that Chief Lamphier is entitled to retire at the special pension rate set forth in D.C.Code § 4–616. The decision of the Retirement Board is reversed, and the case is remanded to the Board for further proceedings consistent with this opinion.

*So ordered.*