OFFICE OF The DISTRICT OF
COLUMBIA CONTROLLER,
Appellant,

v.

Alvin C. FROST, Appellee.

Nos. 92–CV–192, 92–CV–223.

District of Columbia Court of Appeals.

Argued April 15, 1993.
Decided March 14, 1994.

Karen L. McDonald, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Susan S. McDonald, Asst. Corp. Counsel, Washington, DC, were on the brief, for appellant.

Joseph V. Kaplan, Washington, DC, for appellee.

Before TERRY, WAGNER, and KING, Associate Judges.

KING, Associate Judge:

The Office of the District of Columbia Controller ("the employer") appeals an order (No. 92–CV–192) of the Superior Court reversing the decision of the Office of Employee Appeals ("OEA") that affirmed the termination of employment of appellee, Alvin C. Frost ("the employee"). We conclude that the Superior Court did not err in so ruling and accordingly we affirm[1] that part of the trial court's order reversing the decision terminating employment. We reverse, however, the trial court's remand order directing OEA to consider the employer's claim that the sanction imposed amounted to double jeopardy and constituted retaliation for protected activity.

## I. Facts and Procedural History

In 1983, Frost became the manager of the Cash Management Office, a department of the District of Columbia Controller. One of his duties as manager was to ensure the integrity of the office computer system ("the Fortune System") by changing the manager code and other related codes of the system when he discovered any breaks in security in the system.

On January 31, 1986, Frost delivered to the Office of the Mayor a letter criticizing the management of the Cash Management Office, and specifically criticizing his immediate supervisor, Fred Williams. On February 3, 1986, Frost discovered that someone had accessed the Fortune System, by using a confidential code, and had printed a copy of his January 31 letter to the mayor.[2] Upon this discovery of what he perceived to be a security breach, Frost created a new manager code as he had done on prior occasions when he discovered security breaches of the system. Frost did not inform Williams, or anyone else, of the change in the code.

On February 6, 1986, Williams discovered that the manager code had been changed, and he requested that Frost disclose the new code to him. Frost refused. The following day, Williams issued what was entitled a "Letter of Reprimand," in which, *inter alia,* he described Frost's refusal to reveal the code, and stated that Frost's actions "constitute[d] willful disobedience" and that "[u]nder D.C.Law 2–139 this action carries a penalty ranging from reprimand to suspension to removal." Williams directed Frost to: (1) cease and desist from using the Fortune System; (2) relinquish the codes to the Fortune System; and (3) relinquish all materials related to the Fortune System that Frost had in his possession. The reprimand was not delivered to Frost on February 7, the date of issue, because he was on sick leave. When Frost returned to work, on February 10, Williams again requested that he disclose the code. Frost again refused to comply.

---

1. The employer also appeals the Superior Court order denying the employer's Motion for Reconsideration, an order docketed January 24, 1992 (No. 92–CV–223). In that order, the court denied the employer's request that the trial court review the administrative record in its entirety and reconsider its original order—the order in No. 92–CV–192. Because of our resolution of the appeal of the trial court's original order, we need not consider the employer's appeal from the denial of the request for reconsideration of that order. Accordingly, the appeal in No. 92–CV–223 is dismissed.

2. The *Washington Times* published an article on February 6, 1986, in which Frost's letter to the mayor was discussed.

On February 13, 1986, Williams issued a "Letter of Direction" that contained the following passage: "the memorandum entitled 'Letter of Reprimand' dated February 7, 1986 is hereby amended to read 'Letter of Direction.' ... The content of this letter will remain the same with one exception, the penalty clause has been removed." The following day, February 14, the employer issued a notice of proposed removal, to become effective March 4, which listed three "causes and details in support thereof." The first cause was entitled, *"Misuse, mutilation or destruction of District property or funds, to wit, willful mutilation and alteration of official Government records."* Two paragraphs followed in which the employer described the alleged improper conduct and the consequences of the conduct. Included was an allegation that Frost "willfully destroyed the existing super users code and managers code ... and created a new code without informing anyone." Also included was an allegation that Frost's "destruction of these codes prevented appropriate personnel from taking necessary financial management actions for a period of days."

The second cause, entitled, *"Dishonesty, to wit, misappropriation of Government-owned property of more than nominal value,"* described Frost's action of creating a new code without informing anyone of the change as "a wrongful exercise of dominion and control over property belonging to the District, for the purpose of making the code serve your own use, to the exclusion of and inconsistent with, the rights of the District Government." Referring to the misuse charge described earlier in the notice of termination, the second cause also alleged that government officials were unable to access the system.

The final cause for Frost's removal was *"Insubordination, to wit, refusal to comply with written instructions and direct orders by your superior."* Frost does not dispute that he refused to comply with the orders by Williams, but he argued before the agency and in the Superior Court that there were mitigating circumstances which justified his refusal. In this court, however, he does not challenge the finding of insubordination.

Pursuant to 30 D.C.Reg. § 1604.18, at 5886 (1983), a disinterested designee was appointed to receive Frost's response to the proposed removal notice and to issue a report and recommendation to the official who proposed the adverse action. The disinterested designee, in a report issued on March 3, 1986, concluded that each of the three charges was supported and that removal was an appropriate penalty. The employer issued its final decision removing appellee on March 4, 1986, and Frost appealed his termination to OEA on March 19. *See* D.C.Code § 1–606.3(a) (1992) (District employee may appeal an adverse action taken against him).

Following an eight-day evidentiary hearing, a hearing examiner issued an Initial Recommendation. The hearing examiner concluded that changing the code upon discovery of a security breach was within Frost's scope of duties, and that the misuse charge had not been proven because the employer failed to prove the alleged harm, namely, that there was any interference with the actual operations of the Fortune System.[3] The hearing examiner determined that the only difference between the code change Frost made in this instance and those that he had made on prior occasions was that this time Frost did not disclose the new code to Williams. The hearing examiner concluded that Frost's failure to disclose the code was improper conduct, but that it was included within the insubordination cause, rather than the misuse cause.

The hearing examiner also concluded that the employer failed to prove, as alleged in the dishonesty cause, that Frost intended to change the code in order to make it serve his own use. Therefore, since it was Frost's duty to change the code when he discovered a security breach, the examiner found that the dishonesty cause had not been proven. Finally, the hearing examiner determined

---

3. There was uncontroverted evidence that the code could have been reset in approximately ten minutes through the use of a process known as a "cold boot." Instructions on how to perform a "cold boot" were in the Fortune System manuals that were in the possession of the employer during the relevant time periods. Indeed, a "cold boot" was ultimately used to reset the code on February 10, 1986.

that the evidence supported the insubordination cause, but because the Fortune System was never in danger, a five-day suspension was an appropriate sanction instead of removal.

A divided three-member panel of OEA[4] adopted the examiner's recommendation that Frost was insubordinate, but rejected the remainder of the recommendation and affirmed the employer's action removing Frost.[5] Pursuant to D.C.Code § 1–606.1(d) (1987), Frost appealed the decision of OEA's panel to the Superior Court. After a hearing, the Superior Court issued an order on January 16, 1992, reversing and remanding the decision of OEA. The trial court concluded that neither the misuse nor the dishonesty cause was supported by substantial evidence. The trial court affirmed OEA's decision regarding the insubordination charge.

Finally, the court remanded the case to OEA to determine whether the "5 day suspension recommended by the Hearing Examiner was nonetheless excessive or inappropriate in light of the following considerations: a) whether [employee] had already been disciplined for the act of insubordination; b) whether [employee's] discipline was in retaliation for [employee's] protected activity under the D.C. Employees Bill of Rights; [and] c) whether [employee] had been the subject of disparate treatment."

In its appeal to this court, the employer contends that the Superior Court erred: 1) in reversing OEA's findings on the misuse and dishonesty causes and in concluding that a five-day suspension, rather than removal, was the appropriate sanction; 2) in remanding the case to OEA to determine whether Frost had been previously disciplined for his act of insubordination; and 3) in remanding the case to OEA to determine whether Frost's activity was protected under the D.C. Employees Bill of Rights.

## II. Standards of Review

OEA was created to ensure compliance with the Merit Personnel Act and is "a quasi-judicial body empowered to review final agency decisions affecting, *inter alia*, performance ratings, adverse actions, and employee grievances." *Stokes v. District of Columbia,* 502 A.2d 1006, 1009 (D.C.1985) (citing D.C.Code §§ 1–606.1, 1–606.3 (1981)). Rather than substituting its judgment for that of the agency, the role of OEA when reviewing agency action is "simply to ensure that 'managerial discretion has been legitimately invoked and properly exercised.'" *Id.* at 1010 (quoting *Douglas v. Veterans Admin.,* 5 M.S.P.B. 313, 328, 5 M.S.P.R. 280, 301 (1981)). Although in the instant case we are reviewing a Superior Court order reversing the decision of OEA in an appeal filed pursuant to D.C.Code § 1–606.3(d) (allowing an employee or agency to appeal an OEA decision to the Superior Court), "our scope of review is precisely the same as that which we employ in cases that come directly before this court." *Id.* (citing *Kegley v. District of Columbia,* 440 A.2d 1013, 1018–19 (D.C. 1982)). *See also Cocome v. District of Columbia Lottery & Charitable Games Control Bd.,* 560 A.2d 547, 549–50 (D.C.1989) (on appeal from Superior Court's order from an agency finding, this court determines whether the agency's decision, rather than the trial court's decision, was supported by substantial evidence) (citations omitted). That is, "[w]e examine the agency record to determine whether there is substantial evidence to support OEA's findings of fact, or whether OEA's action was arbitrary, capricious, or an abuse of discretion." *Bufford v. District of Columbia Pub. Schools,* 611 A.2d 519, 522 (D.C.1992) (citing *Stokes v. District of Columbia, supra,* 502 A.2d at 1010). An agency "may not reject an ... examiner's findings of disputed fact based on the resolution of witness credibility unless the examiner's findings are unsupported by substantial evidence." *Gunty v. Department of Employment Servs.,* 524 A.2d 1192, 1197–98 (D.C. 1987). "If the administrative findings are

---

**4.** 27 D.C.Reg. § 624.4, at 4369 (1980) provides that an initial recommendation "shall be reviewed by at least a three member panel of the [OEA]."

**5.** One member of the panel dissented from OEA's ruling that the evidence supported the causes of misuse and dishonesty.

supported by substantial evidence, we must accept them even if there is substantial evidence in the record to support contrary findings." *Metropolitan Police Dept. v. Baker*, 564 A.2d 1155, 1159 (D.C.1989) (quoting *Baumgartner v. Police & Firemen's Retirement & Relief Board*, 527 A.2d 313, 316 (D.C.1987)).

### III. The Misuse Cause

In the proposed notice of Frost's termination, the employer alleged that one of the causes for his proposed removal was:

*Misuse, mutilation or destruction of District property or funds, to wit, willful mutilation and alteration of official Government records.*

On or before February 6, 1986, you willfully destroyed the existing super users code and managers code for the Fortune System and created a new code without informing anyone. Your actions were discovered on February 6, 1986, when Mr. Elliott Kindred, System Supervisor, attempted to provide Mr. Michael Hawkins with a pass code to enter the Fortune System, but was unable to do so.

Your destruction of these codes prevented appropriate personnel from taking necessary financial management actions for a period of days, including but not limited to, keying data into the System, giving or deleting other pass codes and updating the System's database. This situation prevented the District Government from developing and generating accurate financial forecasts.

The hearing examiner found, based upon the uncontroverted evidence, that the alleged harm due to Frost's conduct, i.e., the consequences described in the second paragraph following the statement of the cause, was not proven. In short, the hearing examiner concluded that there was no evidence that Frost's actions prevented District employees from taking necessary action related to the computer system or that the government was prevented from making financial forecasts.

The employer does not contend otherwise.[6] The hearing examiner ruled, based on that finding, that the charge of "Misuse, mutilation, or destruction of District property or funds" was not proven by a preponderance of the evidence and could not be sustained. OEA reached a contrary result, however, concluding that Frost's willful concealment of the access code constituted misuse of District property.

"A corrective or adverse action ... may not be taken against any employee except for cause." 30 D.C.Reg. § 1604.3, at 5883 (1983). Included in the definition of "cause" are "Insubordination," "Dishonesty," and "Misuse, mutilation, or destruction of District property." *Id.*; D.C.Code § 1–617.1(d)(5), (6), (14) (1992). OEA regulations also provide that the causes specified in § 1604.3 "shall include, but not necessarily be limited to, the infractions or offenses under each cause, as specified in subsection 1608.6 of this chapter." 30 D.C.Reg. § 1604.4, at 5885 (1983). The majority of the three-member OEA panel concluded, citing 30 D.C.Reg. § 1608.6(14)(c), at 5900 (1983), that misuse, mutilation, or destruction of District property includes "[w]illful concealment, removal, mutilation, alteration, or destruction of government property or official records." OEA's panel majority determined that by willfully "concealing" the newly-created access codes, Frost was guilty of misuse, mutilation, or destruction of government property within the meaning of D.C.Code § 1–617.1(d)(14) (1987).

In this court the employer contends that it must prove only that the employee's conduct amounted to misuse as defined by the regulation. At most, it is argued, only the underlined portion of the cause must be established: *"Misuse, mutilation or destruction of District property or funds, to wit, willful mutilation and alteration of official Government records."* The employer maintains that the material contained in the two paragraphs following are merely descriptive, and therefore need not be proven. On the other hand,

---

6. At one time while Frost was in exclusive knowledge of the access code, another employee asked Frost for the access code so that he could give a password to a new employee. Although Frost refused to reveal the code, he used the access code himself and created a password for the new employee that permitted the employee to gain access to the computer.

the hearing examiner found that all the elements of the cause, including the allegations set forth in those two paragraphs, must be established before the employee can be disciplined.[7]

■ Before any sanction can be imposed, an employer is required to provide an employee, against whom an adverse action is recommended, with advance written notice "stating any and all causes for which the employee is charged *and the reasons, specifically and in detail, for the proposed action.*" 30 D.C.Reg. § 1604.6, at 5885 (1983) (emphasis added). The purpose of requiring a specification of the details is to apprise the employee of the allegations he or she will be required to refute or the acts he or she will have to justify, thereby affording the employee a fair opportunity to oppose the proposed removal. *Sokoloff v. United States,* 4 Cl.Ct. 140, 143 (1983) (quoting *Burkett v. United States,* 185 Ct.Cl. 631, 634, 402 F.2d 1002 (1968)); *see also Money v. Anderson,* 93 U.S.App.D.C. 130, 133, 208 F.2d 34, 37 (1953) (charges for removal "must be specific enough to provide a fair opportunity for refutation"); 4 EUGENE McQUILLIN, MUNICIPAL CORPORATIONS § 12.257.15, at 578 (3d ed. 1992) (removal charges must contain sufficient specifications of the grounds or causes for action to enable the employee to prepare an explanation or defense). Thus, the employer was required to set forth, in the notice of proposed removal, the conduct which formed the basis for employee's cause for removal. There is no contention that the employer failed to provide adequate specifications. Rather, Frost maintains that the employer was required to prove all of the specifications in his notice of proposed re-

moval in order to establish the cause, and the employer's failure to do so precludes a finding against him on the misuse charge.[8]

Frost was charged with misuse based on his alleged willful alteration of the access code. In addition, the misuse cause specified that Frost's actions interfered with the District government's ability to operate and develop financial information for a period of days. The hearing examiner could only have concluded that the latter allegation went to the heart of the claim against Frost since it was the employer's failure to establish the alleged harm to the District that formed the only contested ground for the examiner's holding that the misuse charge had not been proven.[9] OEA did not reach a contrary conclusion, but ruled that the employer had otherwise established the misuse charge.

Thus, this case comes to us in the following posture: Frost urges us to uphold the hearing examiner's ruling that the employer must prove both the actual charge made and the consequences that were alleged to have resulted from Frost's conduct. There is no dispute that the employer failed to meet that burden and, in reaching a contrary result, the OEA majority did not rule that the hearing examiner was wrong in concluding that both charge and consequences must be proven. Instead, OEA held that the misuse charge was proven, based on a different ground, and the employer argues that we should affirm that result. Since we conclude, however, that the alternative basis relied upon by OEA cannot be supported, we do not address the question of whether both the charge and consequences must be established as found by the hearing examiner.

7. The notice of proposed removal stated that Frost was being removed "for the following causes *and details in support thereof*" (emphasis added). The notice then went on to state the three causes, i.e., misuse, dishonesty, and insubordination (which were underlined), with factual allegations supporting each set forth in separate paragraphs.

8. In support of his position, Frost cites *Burroughs v. Department of the Army,* 918 F.2d 170, 172 (Fed.Cir.1990), where the court ruled that "[i]f the agency fails to prove one of the elements of its charge, then the entire charge must fail." The employer, however, does not dispute the

general proposition that it must prove each element of a charge, but contends that the alleged adverse consequences specified in the notice are not "elements" of the charge.

9. The hearing examiner held: "Since Employee acted within the scope of his duties in changing the code, and *since Agency has failed to prove the harm alleged to have occurred by Employee's changing the code* ... [the misuse cause] has not been proven by a preponderance of evidence" (emphasis added). It was not disputed that Frost acted within the scope of his duties when he changed the code.

■ OEA's ruling against Frost was premised entirely upon its conclusion that Frost willfully "concealed" the access code.[10] The governing statute establishes cause for removal for "misuse, mutilation or destruction of District property." D.C.Code § 1–617.1(d)(14). No definition of those terms is provided in the statute; however, OEA relied on a regulation which interprets "misuse, mutilation or destruction" to include "[w]illful concealment, removal, *mutilation, alteration,* or destruction of government ... official records." DCOP Regulation § 1603.6(14)(c) (emphasis added). In the proposed notice of termination, in the "to wit" clause, Frost was charged only with the conduct italicized above, i.e. "mutilation" and "alteration" ("to wit, willful mutilation and alteration of official Government records"). He was not charged, however, with "concealment." In short, Frost was never informed that the charge leveled against him was "willful concealment"; therefore, he could not have been expected to prepare to defend against such a claim.[11]

Moreover, substantial evidence was lacking to support a finding of misuse premised upon the allegations actually made. *See Bufford, supra,* 611 A.2d at 522 (this court reviews the agency record to determine whether there is substantial evidence to support OEA's findings of fact). The "Government records" involved was the access code. The parties stipulated that Frost changed the code; thus there is no question that the evidence supports a finding that Frost altered a government record. That finding does not, however, establish that Frost misused government property since the parties also stipulated that it was his *duty* "to ensure the integrity of the office computer system ... [and that] [t]his duty previously resulted in his having changed the manager and other related codes upon discovery of breaks in security." Thus, although Frost certainly did alter an

official government record, it is clear that it was his duty to do so. Therefore, he cannot be disciplined for that conduct.

In sum, the hearing examiner found that on February 3, 1986, Frost was confronted with a breach of security and was thus required, as part of his official duties, to change the access code. There is no claim that the hearing examiner's finding on that point is not supported by substantial evidence. *See Gunty, supra,* 524 A.2d at 1198. Moreover, the hearing examiner concluded that the only difference between the present code change and prior code changes made by Frost was that on this occasion Frost failed to disclose the new code to his supervisor. In the misuse cause, however, there was no allegation that Frost should be held accountable for failing to disclose the new code to his supervisor. Indeed, "failure to disclose," as the hearing examiner ruled, actually related to the insubordination cause. OEA did not dispute any of the hearing examiner's factual findings. Instead, the panel simply concluded that Frost's willful concealment of the access code amounted to misuse of government property or official records as defined in the regulations, even though he was not charged with such conduct as a violation.

OEA's holding was based upon the regulation that describes "willful concealment" of government property or official records as a category of misuse. 30 D.C.Reg. § 1608.-6(14)(c), at 5900. It may well be, under appropriate circumstances, that a finding of willful concealment would constitute misuse. In this case, however, Frost was not charged with willful concealment of the access code. Rather, he was charged in the notice of proposed termination with "willful mutilation and alteration" of the code. As we have shown, Frost cannot be disciplined for such conduct since it was his duty to have so acted. Having so charged Frost with misuse, the employer cannot prevail premised

---

10. OEA's ruling on the misuse cause is set forth in two sentences: "Here, Employee willfully concealed the access codes from [F.W.]. Employee's decision to willfully conceal the access codes amounted to misuse, mutilation, or destruction of government property within the means of D.C.Code § 1–617.1(d)(14) and DCOP Regulation § 1608.6(14)(c)."

11. He was also charged with conduct having an adverse effect upon government operations, but that, too, was never established. The OEA panel majority opinion contains no discussion whatsoever of the effect, if any, of the employer's failure to prove the alleged consequences of Frost's conduct.

upon a finding of willful *concealment* of a government record.

## IV. The Dishonesty Cause

■ The employer described the second cause for Frost's proposed removal as:

*Dishonesty, to wit, misappropriation of Government-owned property of more than nominal value.*

On or before February 6, 1986, you intentionally created a new super users code and a new managers code for the Fortune System, such codes being unknown to anyone else. This constituted a wrongful exercise of dominion and control over property belonging to the District, *for the purpose of making the code serve your own use, to the exclusion of and inconsistent with, the rights of the District Government.* During the times that these codes were under your exclusive control, appropriate District officials could not access the System, as detailed above [referring to the Misuse Charge discussed in Part III. of the opinion], and could exercise no control over the District's financial forecasting apparatus.

(Emphasis added). The hearing examiner found that the evidence did not support that portion of the allegation, emphasized above, that the employee intended to make the code serve his own purposes to the exclusion of the District government. To the contrary, the hearing examiner found that, as with the misuse cause, the employee changed the code because it was his duty to do so whenever he discovered a security breach within the computer system. The examiner concluded, therefore, that the employer failed to prove the dishonesty cause by a preponderance of the evidence.

Without disagreeing in any way with the examiner's factual findings, OEA reached a different conclusion. Noting that Frost admitted he changed the code in an attempt to prevent his supervisor from ascertaining in-

formation in the computer, OEA held that the employer had proven the dishonesty cause. OEA ruled, citing 30 D.C.Reg. § 1608.6(6)(d), at 5896 (1983), that the regulations have interpreted the term "dishonesty" to include "[m]isuse, whether or not for personal gain, of government funds or property, or other funds or property which come into the employee's possession by reason of his or her official position." Based on that regulation, OEA determined that Frost "deliberately used his exclusive knowledge of the new access codes in an attempt to restrict [his supervisor's] access to the computer system [and that such] conduct amounted not only to a misuse of the access codes, but also a misuse of the computer system."

In short, the OEA's panel majority ruled that this cause was proven because Frost's conduct amounted to dishonesty under the regulation—30 D.C.Reg. § 1608.6(6)(d)—that defined dishonesty as "misuse, whether or not for personal gain of government funds or property." That finding by OEA cannot be sustained. As we held in Part III, *supra,* substantial evidence to support a finding of misuse was lacking. Thus, since the dishonesty cause was based upon the identical conduct as that described in the misuse cause, the evidence of misuse under the dishonesty cause was necessarily also lacking.[12] *See Gunty, supra,* 524 A.2d at 1198.

## V. The Double Jeopardy Claim

The trial court remanded the case to OEA to determine, *inter alia,* whether the employee had already been disciplined for his act of insubordination. Frost contended that because he initially received what was entitled a "Letter of Reprimand," a "corrective action" as defined in 30 D.C.Reg. § 1601, at 5877 (1983), he could not be disciplined again (i.e., removed from his position) on the basis of the same conduct addressed in the Letter of Reprimand.[13] He initially raised the "dou-

12. The notice also charged that while the employee was in "exclusive control" of the codes, "appropriate District officials could not access the System, as detailed above [referring to the Misuse charge], and could exercise no control over the District's financial forecasting apparatus." As we noted earlier, there is no evidence that government operations were affected in any

way by Frost's actions, and the employer does not argue to the contrary. Thus, there is also a failure of proof as to that allegation.

13. The term "double jeopardy" is used by the parties and the agency to describe the administrative law principle that precludes an agency from taking any adverse action against an em-

ble jeopardy" argument before the hearing examiner at the beginning of the hearing. The examiner denied Frost's motion for "a summary grant of the appeal on the grounds that he had already been disciplined," on the basis that Frost failed to raise that issue in any of the pre-hearing proceedings. Frost maintains otherwise, claiming that he raised the double jeopardy issue prior to the beginning of the hearing. In support, he cites a *pro se* submission, filed pre-hearing, in which he asserted that "the proposed penalty was improperly increased in violation of D.C.Code [sic] Sec. 1604.25." [14] That code section, however, provides that "[i]n no case may a disinterested designee recommend a penalty greater than that proposed in the notice." The hearing examiner rejected Frost's contention that this *pro se* submission raised a double jeopardy claim, ruling that the finding by the examiner on this point was a "finding of fact" which was inappropriate for interlocutory appeal.[15] The hearing examiner acknowledged, however, that the double jeopardy issue could be raised in a petition for review.

■ The trial court, without explanation, reversed the hearing examiner's "finding of fact" and remanded the double jeopardy issue to OEA. We conclude that was error. The trial court provided no basis, nor can we discern any, for overturning the examiner's finding that the double jeopardy claim was not properly raised. Indeed, we believe it is clear that Frost's statement was not a reference to a claim of double jeopardy due to the employer's actions. Frost's *pro se* submission did refer to an improperly increased penalty, but it specifically cited 30 D.C.Reg. § 1604.25, at 5887, a provision which bars a

disinterested designee from recommending an action that is more severe than the action stated in the proposed notice. That provision, however, does not in any way relate to an increase in punishment by the employer as is alleged here. Thus, we conclude that Frost's reference to § 1604.25 could not form the basis for a claim that removal was an improper sanction based on the fact that Frost previously had been issued a Letter of Reprimand/Direction by the employer.[16]

## VI. The Retaliation Claim

■ The employee contends that the hearing examiner erred in not considering his contention that he was sanctioned in retaliation for his public comments criticizing the operation of the office where he was employed. In a post-status conference report and order, the hearing examiner ruled that she would not consider the employee's retaliation defense because issues of retaliation were beyond the jurisdiction of OEA and were specifically reserved for the Public Employees Relations Board ("PERB"). This decision was made prior to the hearing and was not mentioned in the hearing examiner's initial recommendation. Accordingly, the retaliation claim was not addressed by OEA's panel. Frost did present this issue to the trial court, however, arguing that OEA had jurisdiction over his retaliation claim.[17] The trial court remanded the case to OEA for a determination of whether Frost's five-day suspension was appropriate in light of his claim that the discipline was retaliation for protected activity under D.C. Employee Bill of Rights.[18] We conclude the trial court erred in so doing.

D.C.Code § 1–618.4(a)(4) (1992), entitled "Unfair labor practices," prohibits the Dis-

---

ployee who has previously been disciplined or subjected to some adverse action for the same incident. *See Adamek v. United States Postal Service*, 11 MSPB 482, 13 M.S.P.R. 224, 226 (1982). There is no contention that the double jeopardy provision in the United States Constitution applies in employee discipline matters.

14. The correct cite is 30 D.C.Reg. § 1604.25, at 5887 (1983).

15. The hearing examiner rejected employee's claim that he cited this section because he could not find a provision on double jeopardy.

16. In its brief and reply brief, the employer argued that Frost's double jeopardy and retaliation claims could not be considered by this court due to employee's failure to exhaust his administrative remedies. At oral argument, however, the District abandoned that argument and conceded that the issues were properly before this court.

17. The alleged basis for the retaliation against employee was his testimony against his supervisors given before the Council of the District of Columbia.

18. The Employee Bill of Rights, D.C.Code § 1–616.2 (1992), provides District employees with

trict, its agents, and representatives from "[d]ischarging or otherwise taking reprisal against an employee because he or she has signed or filed an affidavit, petition, or complaint or given any information or testimony under this chapter." Frost contends that although the statute refers to information or testimony "given under this *chapter*," it is more properly read as referring to information or testimony given under the *subchapter* in which the section is located, namely "Labor–Management Relations." Thus, Frost reasons, PERB has exclusive jurisdiction only over reprisals arising from testimony "given in regards to the collective bargaining labor-management relations program," but not over *any* reprisal for a matter connected with the Merit System Act.

Frost's contention, however, has been expressly rejected by OEA. In *Employee v. Agency*, 34 D.C.Reg. 5942, 5945–46 (1987), OEA determined that § 1–618.4(a)(4) "plac[es] jurisdiction over [an] [e]mployee's claim of retaliation with … PERB, which is charged with the responsibility of establishing a program to resolve allegations of unfair labor practices." Frost's argument is based upon his understanding that PERB deals only with matters within the collective bargaining context. The agency, in *Employee v. Agency, supra,* does not dispute that interpretation, acknowledging that PERB's jurisdiction was "*generally* limited to union matters." *Id.* at 5946 (emphasis added). OEA went on to explain, however, that § 1–618.4(a)(4) "clearly gives [PERB] broader authority with respect to the question of reprisal for testimony under the Act [and that] [s]uch a grant of authority is reasonable in view of PERB's experience in such matters because the issue of reprisal arises often in the labor management context." *Id.* OEA concluded, therefore, that it "ha[d] no jurisdiction over the reprisal defense." *Id.*

"[I]t is well settled in this jurisdiction that we defer to an agency's interpretation of a statute it administers unless that interpreta-

tion is unreasonable in light of the prevailing law, inconsistent with the statute, or plainly erroneous." *Davis v. University of the District of Columbia,* 603 A.2d 849, 851 (D.C. 1992) (citations omitted). In *Employee v. Agency, supra,* OEA specifically rejected Frost's contention that OEA, rather than PERB, has jurisdiction over reprisal claims. Frost's interpretation would have us read "under this *chapter*" as "under this *subchapter.*" OEA's interpretation, however, adheres to the plain language of § 1–618.4(a)(4), and we conclude that the interpretation is a reasonable one. Thus, we defer to OEA's holding that only PERB has jurisdiction over claims of retaliation.[19]

## VII. Disparate Treatment

Finally, we note that the trial court's ruling that the case be remanded to OEA to determine whether the five-day suspension was appropriate in light of Frost's claim that he had been the subject of disparate treatment was not challenged by the employer in this appeal. Thus, we do not address that portion of the trial court's ruling.

## VIII. Conclusion

In No. 92–CV–192, for the reasons stated, that portion of the trial court's order reversing OEA's determination that the employee engaged in misuse and dishonesty is affirmed. The portions of the order remanding the case to OEA to address the employee's double jeopardy claim and the employee's retaliation claim are reversed. Accordingly, the trial court's order that the employee be reinstated and awarded back pay and benefits is affirmed, and the case is remanded to the trial court for entry of an order remanding to OEA to determine the disparate treatment claim. In No. 92–CV–223 the appeal is dismissed.

*So Ordered.*

the right, *inter alia*, "to communicate freely and openly with members of the Council." § 1–616.-2(3).

**19.** The regulations now specifically provide that OEA does not have jurisdiction "[o]ver com-

plaints of unfair labor practices as described in D.C.Code 1–618.4 (1987 ed.). Such matters shall be referred to the D.C. Public Employee Relations Board." 39 D.C.Reg. § 604.2(f), at 7407 (1992).