DISTRICT OF COLUMBIA, Petitioner,

v.

Robert L. KING, Respondent.

No. 98–CV–1556.

District of Columbia Court of Appeals.

Argued Nov. 23, 1999.

Decided Jan. 25, 2001.

Sheila Kaplan, Assistant Corporation Counsel, with whom John M. Ferren, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy

Corporation Counsel, were on the brief, for petitioner.

Mark L. Shaffer, Washington, for respondent.

Before SCHWELB, REID and GLICKMAN, Associate Judges.

REID, Associate Judge:

Beginning around 1991, when the District of Columbia was in the midst of a fiscal crisis, the Council of the District of Columbia enacted a series of emergency and temporary acts authorizing a reduction in the District's workforce ("RIF").[1]

The emergency and temporary legislation added a new section to the District of Columbia Government Comprehensive Merit Personnel Act of 1978 ("the CMPA"), § 2405, which authorized "the abolishment of excess positions."[2] Under § 2405(a) of the CMPA, "each agency head [was] authorized, within the agency head's discretion, to identify positions, outside existing collective bargaining units, and at grades 11 and above of the District Service Schedule or at equivalent levels of other salary or pay schedules, for abolishment as excess positions," subject to the Mayor's approval, upon recommendation of an Executive Review Committee. Section 2405(d) of the CMPA also specified that:

> An employee affected by the abolishment of an excess position pursuant to this section who, but for this section would be entitled to compete for retention, shall be entitled to 1 round of competition pursuant to Chapter 24 of the District of Columbia Personnel Manual, which shall be limited to positions in the employee's competitive level and shall not include positions in existing collective bargaining units.

D.C.Law 9–47 § 2405(d).[3]

Mr. King challenged his November 1991 removal from his position as a special assistant to the Director of the Department of Public and Assisted Housing ("the DPAH"). The Chief Administrative Law Judge, Judge Gregory Lattimer, concluded that Mr. King was improperly terminated under the RIF action. The OEA reversed that determination and Mr. King appealed to the Superior Court of the District of Columbia, which reversed the OEA's decision. The District of Columbia appealed to this court. We affirm the judgment of the Superior Court, which restored the November 23, 1993 decision of Judge Lattimer and ordered that Mr. King be given the relief provided in that decision.

## FACTUAL SUMMARY

The record on review shows the following pertinent factual and procedural background. In 1988/89, Mr. King, who had been a District career employee since 1983, was detailed to the drug policy control office in the DPAH Director's office to help launch a program called, "Not on my Block," designed to eliminate drugs in the District on a block-by-block basis. Apparently as part of the plans for this initiative and a proposed application for federal funding, a position vacancy announcement was issued on June 6, 1990, with a closing date of June 22, 1990, for the position of Special Assistant, DS–301–14, DPAH, Office of the Director. Mr. King applied for the position whose official job description specified, in part:

---

1. *See* the "District of Columbia Government Comprehensive Merit Personnel Act of 1978 Emergency Amendment Act of 1991," D.C. Act 9–65, 38 DCR 4935 (1991); the "District of Columbia Temporary Amendment Act of 1991," D.C. Act 9–85, 38 DCR 6460 (1991), D.C. Law, 9–47, 39 DCR 163 (1992).

2. *See* note to D.C.Code § 1–625.4 (1992), "Temporary addition of section."

3. Initially, employee appeals resulting from adverse actions under section 2405 of the CMPA were handled by an independent three-person Temporary Panel ("TAP") of the Office of Employee of Appeals ("OEA"), appointed by the Mayor with the approval of the Council. Later, the functions of the TAP were transferred to the OEA.

As Special Assistant to the Administrator, the incumbent provides direction, coordination and advisory services on the widespread, highly complex and sensitive issue of drugs in public housing. The primary focus is on the coordination and management of programs involving the Department's efforts to control and/or eliminate drugs in public.

Keeps abreast of laws, regulations, issues and developments that affect the implementation of a drug strategy; and informs the Administrator of the impact on Departmental decisions and plans....

The incumbent will act as the official liaison and Departmental representative for contacts with public housing communities, the D.C. Drug Control Policy Office; other D.C. agencies and departments; and private and local and national drug control associations for the purpose of obtaining information and resources related to drug enforcement and treatment activities.

Prepares sensitive correspondence which requires in depth knowledge and understanding of the personal policies and views of the Administrator....

Furthermore, the position officially required, in part, the following knowledge and experience:

Knowledge of the purpose, operation, methodologies and techniques utilized in program operations and familiarity with DPAH's organizational structure, missions, functions, processes, objectives and policies to expeditiously and accurately complete assignments....

Knowledge of management practices, theories and techniques to effectively analyze organizational, program and community problems.

Thorough knowledge of federal and District of Columbia drug enforcement laws, regulations and guidelines....

The vacancy announcement for the position identified knowledge of federal and local drug enforcement laws as a selective factor.

Despite the position description for his special assistant position, however, Mr. King maintained that he never really served in the drug position because DPAH's anti-drug initiative was not accepted by the Federal Department of Housing and Urban Development ("HUD"). When the HUD funding did not materialize, and after administrative changes due to the arrival of a new mayor, Mr. King was "reassigned [on January 14, 1991 to the Housing Management Administration] and given the job of being responsible for the trash contracts and the fire contract for the [DPAH]."

On October 1, 1991, Mr. King was notified by the DPAH that his position was deemed "excess" under the RIF law, and that his employment would be terminated, effective November 8, 1991. On November 21, 1991, Mr. King filed an appeal with the TAP claiming that he was improperly terminated from his employment due to DPAH's failure to properly place his position in a competitive level with other Special Assistants to the Director. He maintained that the unique knowledge of drug laws required by his written position description should not have excluded him from other similar special assistant jobs whose position descriptions did not require specific knowledge of drugs. He also asserted that DPAH erred when they denied him his entitled "1 round of competition," and subsequently terminated his employment without allowing him to compete for other special assistant positions within the DPAH.

### The TAP Decision

Administrative Judge Robin J. Nash, of the TAP, initially heard testimony in this matter on June 3, 1992, July 6, 1992, and July 29, 1992, but subsequently was replaced by Chief Administrative Judge Gregory Lattimer, without objection from the parties. During the initial hearing before the TAP, Beatrice Smith, Assistant Director of Personnel, District of Columbia

Personnel Office ("the DCOP"), testified on behalf of the District. Karen Qawiyy, who was formerly employed with the DPAH as the chief of the Office of Administration and Management, offered testimony for Mr. King who also testified on his own behalf.[4]

Ms. Smith, who testified as an expert in the field of personnel management and classifications in the District government, maintained that Mr. King's competitive level was properly constructed and explained that when positions are eliminated in a RIF, job descriptions and categorized competitive levels are considered based upon the compatibility of the positions. Therefore, the competitive levels should consist of "all positions in the same pay system ... series and same grade level with similar duties and responsibilities and qualifications, requirements with the same working conditions except union positions...." Although there were other jobs that had position descriptions that were similar to Mr. King's, Ms. Smith stated that there were no other positions that were established for the singular purpose of eliminating drugs in assisted housing. On cross-examination however, Ms. Smith indicated that her opinions were solely derived from her review of documents, and that she did not contact DPAH management to confirm the factual basis for her analysis.

Ms. Qawiyy worked for DPAH from February 1988 until February 1996 and coordinated all personnel actions with the DCOP. Furthermore, she played a direct role in creating job descriptions for all of DPAH's positions, identifying functions, staffing and actual job descriptions. She stated that the special assistant positions were designed to be interchangeable to facilitate the movement of people to different parts of the DPAH. She declared that the drug knowledge requirement in Mr.

King's position description did not distinguish his job from other positions because the reference to drugs did not delineate the function or duty of the position. Ms. Qawiyy stated that neither she, nor the Director of DPAH at the time, ever approved the selective placement factor of "knowledge of District drug enforcement law[,] regulations and guidelines," with respect to Mr. King's position.

On November 23, 1993, Judge Lattimer filed an initial decision in Mr. King's case. Earlier, on September 13, 1993, Judge Lattimer had granted Mr. King's motion to "limit [Ms. Smith's] testimony to opinions based upon evidence of record and personal knowledge." Judge Lattimer decided that Ms. Smith's "testimony[,] which was factual in nature and based upon [her] review of documents not in evidence, consultation with individuals who did not testify, or hearsay, was stricken from the record ... [even] though such testimony formed a great deal of [her] testimony." Judge Lattimer credited Ms. Qawiyy's testimony but discredited Ms. Smith's testimony. As he put it:

> I find it beyond astonishing that the Government's expert witness [Ms. Smith] never consulted with *anyone* from DPAH prior to testifying that the establishment of [Mr. King's] competitive level was *proper*. Even more incred[ible], I find, is the additional fact that the [DPAH] officials who were heard in this matter disagree with the position advanced by the Government and specifically, with the testimony of the Government's expert witness.

Furthermore, Judge Lattimer found that:

> The testimony of [Ms.] Smith is totally devoid of substance, or any indicia of reliability whatsoever.... [T]he Government advances a position that is supported by nothing more than the testimony of an alleged expert, who has no

---

**4.** Ms. Smith, Ms. Qawiyy and Mr. King also testified at a December 18–19, 1996 hearing, which was ordered by the trial judge in an effort to reconstruct the June July 1992 hear-

ing. The tapes from that hearing were in such poor condition that they could not be transcribed.

personal knowledge of the way the Agency works, no familiarity with the Special Assistant positions, and who has had no discussions with anyone from the Agency, at anytime, about anything remotely associated with the issues in this case.

Although the District was given the opportunity to present a fact witness prior to the issuance of Judge Lattimer's decision, it did not do so.

After analyzing all the evidence presented in the case, Judge Lattimer concluded that the Government:

> failed in all respects to prove by a preponderance of the evidence that [Mr. King] was properly released from his competitive level or that it properly established [Mr. King's] competitive level.... Therefore, I find that [Mr. King's] competitive level was improperly constructed as a matter of law.

In concluding that Mr. King's competitive level was improperly constructed, Judge Lattimer found, contrary to the testimony of Ms. Smith, that several DPAH special assistant positions were interchangeable. In fact, as even Ms. Smith agreed, seventeen "components" applied both to Mr. King's special assistant position and at least to one occupied by another special assistant. These components included: legislative analysis; policy analysis; managing and planning; and advising and reporting regarding program goals and resources.

Judge Lattimer also relied on the testimony of Ms. Qawiyy, stating:

> As to the interchangeability of the Special Assistants at the [DPAH], the person responsible for creating the positions, duties and responsibilities, identified twelve (12) positions that were interchangeable, [These positions are identified as positions 1–8 and 9–21 in [Mr. King's] Exhibits 2, 2a and 2b]. As to the position occupied by Kyla Williams, that Ms. Smith agreed had (17) similar components with the position of [Mr. King], Ms. Qawiyy specifi-

cally notes that it is 100% compatible with [Mr. King's] position. Significantly, the testimony of Ms. Qawiyy is uncontested on these issues.

Ms. Qawiyy asserted that drugs "did not distinguish" Mr. King's position, and that "DPAH had no responsibility for drug enforcement." Furthermore, as the person responsible for the development of position descriptions for the DPAH special assistants, she did not identify "thorough knowledge of federal, District of Columbia drug enforcement law, regulations, or guidelines" as a selective factor for Mr. King's position. Similarly, Judge Lattimer specifically found that:

> [U]nder the knowledge requirements of [Mr. King's] position description, there are four requirements preceding knowledge of drug enforcement laws. This fact alone would tend to suggest that the emphasis Ms. Smith placed on the "knowledge of drug enforcement laws" was somewhat misplaced.

Consequently, Judge Lattimer determined that not only was Mr. King's competitive level constructed improperly, but also that the way in which it was established constituted "harmful error" because Mr. King "was not released from his position in proper retention order" since he was denied one round of competition, even though he "was not the junior DS–301–14 special assistant at the [DPAH]."

### The Appeal to OEA

On December 28, 1993, the District filed a petition for review of Judge Lattimer's decision. Since the TAP had been dissolved, as of November 30, 1993, Mr. King's case was transferred to OEA. In its March 18, 1994 decision reversing Judge Lattimer's order and upholding DPAH's termination of Mr. King, OEA stated, in part:

> [I]n order for [Mr. King's] position to be in the same competitive level as the other Special Assistants, the qualifications for each position would have to be

sufficiently alike so that the incumbent of any position would be automatically qualified to perform the official duties and responsibilities of [Mr. King's] position. Since none of the other Special Assistant positions require drug enforcement knowledge or contain major duties involving drug policy, these positions were properly excluded from Employee's competitive level. Therefore, we find that [the DPAH] produced adequate evidence to prove that [Mr. King's] competitive level was properly constructed and that [the DPAH] properly applied RIF procedures in releasing [Mr. King] from his competitive level.

In reaching this conclusion, the OEA first observed that the competitive level is based on the official position description. Second, the OEA found Ms. Qawiyy's testimony, "that [Mr. King's] position did not require drug enforcement knowledge," to be "in conflict with the official position description," which emphasized drug functions, whereas those for other special assistants did not contain duties in the drug or drug-related area.

In accordance with D.C.Code § 1–606.3(d), Mr. King filed a petition for review of the DPAH decision to the Superior Court, on April 15, 1994.[5] After delay, caused by (1) a default judgment which later was vacated; (2) unsuccessful efforts to settle the case; and (3) the lack of a transcript of the agency hearing, the Honorable Stephen G. Milliken ordered the OEA to reconstruct the transcript by re-

hearing testimony, as originally presented.[6] Subsequently, Judge Milliken reversed the OEA's decision and reinstated Judge Lattimer's decision. In essence, Judge Milliken determined that the OEA did not review Judge Lattimer's decision under the proper standard. Judge Milliken recognized that the OEA ignored significant factual findings of Judge Lattimer:

> Based on record facts, TAP Judge Lattimer found that Mr. King's competitive level was improperly constructed. The OEA decision finds the determinative fact to be a point in the official position description that requires a knowledge of drug laws. Judge Lattimer found, based on a cogent distillation of facts, that four knowledge requirements preceded the knowledge of drug enforcement laws. Knowledge of drug enforcement was not as paramount to the position description as the [DPAH] argues, and TAP Judge Lattimer refused to elevate the form of the position description over the substance of the job, as found, and not erroneously[,] on record facts.

The District filed a timely appeal.

### ANALYSIS

The District contends that the OEA correctly determined that it properly followed RIF procedures in terminating Mr. King. Specifically, the District maintains that "Mr. King's competitive level was correctly based on his official position of record," and that Judge Lattimer's administrative

---

**5.** Section 1–606.3(d) (1992) provides: "Any employee or agency may appeal the decision of the [OEA] to the Superior Court of the District of Columbia for a review of the record and such Court may affirm, reverse, remove, or modify such decision, or take any other appropriate action the Court may deem necessary."

**6.** The case was assigned, initially, to the Honorable Patricia A. Wynn who attempted to settle the matter. While preliminary agreement was reached as to "the necessary elements for settlement," the parties never presented an actual settlement agreement to the court for approval. Therefore, the matter

was set for a status conference on February 3, 1995. When no representative of the District appeared for the status conference, Judge Milliken ordered the terms of the settlement agreement to be implemented, without a resolution of disputed issues raised by Mr. King. On March 2, 1995, the District maintained that it had not received notice of the status conference, and challenged the order pertaining to the implementation of settlement and the default judgment. On June 27, 1995, Judge Milliken concluded that the initial settlement agreement was unenforceable, and decided to proceed with the matter.

"decision was based on a misinterpretation of the law." Mr. King argues that the OEA erroneously based its reversal of Judge Lattimer's TAP decision on its rejection of his factual findings, even though its review should have been limited to legal errors. Furthermore, Mr. King maintains that the OEA's decision is supported neither by the factual record, nor by the case law.

■ In *Office of D.C. Controller v. Frost,* 638 A.2d 657, 660–61 (D.C.1994), we summarized our standard of review of a Superior Court decision in an OEA matter:

> Although in the instant case we are reviewing a Superior Court order reversing the decision of OEA in an appeal filed pursuant to D.C.Code § 1–606.3(d) (allowing an employee or agency to appeal an OEA decision to the Superior Court), "our scope of review is precisely the same as that which we employ in cases that come directly before this court." *Stokes v. District of Columbia,* 502 A.2d 1006, 1010 (D.C.1985) [other citations omitted]. That is, "we examine the agency record to determine whether there is substantial evidence to support OEA's findings of fact, or whether OEA's action was arbitrary, capricious, or an abuse of discretion." *Bufford v. District of Columbia Pub. Schools,* 611 A.2d 519, 522 (D.C.1992) (citing *Stokes, supra,* 502 A.2d at 1010). An agency "may not reject an ... examiner's findings of disputed fact based on the resolution of witness credibility unless the examiner's findings are unsupported by substantial evidence." *Gunty v. Department of Employment Servs.,* 524 A.2d 1192, 1197–98 (D.C.1987). "If the administrative findings are supported by substantial evidence, we must accept them even if there is substantial evidence in the record to support contrary findings." *Metropolitan Police Dept. v. Baker,* 564 A.2d 1155, 1159 (D.C.1989) (quoting *Baumgartner v. Police & Firemen's Retirement & Relief Board,* 527 A.2d 313, 316 (D.C.1987)).

The scope of the Superior Court's review of an OEA decision is the same as ours. *See Kegley v. District of Columbia,* 440 A.2d 1013, 1018 (D.C.1982).

Simply put, the question in this case is whether, in determining Mr. King's proper competitive level during the RIF process, the OEA may ignore: (a) factual findings made by an administrative judge, and (b) that judge's reliance on the interpretation of Mr. King's expert witness regarding how special assistant official position descriptions were constructed and should be interpreted? To begin our analysis of this question, we set forth the applicable regulation concerning competitive levels:

> A competitive level shall consist of all positions in a competitive area in the same pay system, grade or class, and series which are outside existing collective bargaining units and are sufficiently alike in qualification requirements, duties, responsibilities, and working conditions so that the incumbent in any one (1) position could perform successfully the duties and responsibilities of any of the other positions, without any loss of productivity beyond that normally expected in the orientation of any new but fully qualified employee.

District of Columbia Personnel Manual, § 2468.4. This provision was virtually identical to the comparable federal reduction in force competitive level provision that was in effect at the time of DPAH's RIF action involving Mr. King:

> Each agency shall establish competitive levels consisting of all positions in a competitive area which are in the same grade (or occupational level) and classification series and which are similar enough in duties, qualification requirements, pay schedules, and working conditions so that the incumbent of one position could successfully perform the critical elements of any other position upon entry into it, without any loss of productivity beyond that normally expected in the orientation of any new but fully qualified employee....

5 CFR § 351.403(a), 51 FR 318 (1986). Subsequently, in 1995, the Federal Office of Personnel Management "reworded [the last clause of § 351.403(a)] for clarity and consistency with decisions of the Merit Systems Protection Board" to read:

> ... so that an agency may reassign the incumbent of one position to any of the other positions in the level without undue interruption.

5 CFR § 351.403(a), 60 FR 3055 (1995).

We agree with the trial court that under OEA Rule 614.1(b), DPAH had the burden "to prove by a preponderance of the evidence that the RIF action was conducted in accordance with applicable law, rules and regulations." Thus, DPAH had the burden of showing that the competitive levels for its RIF were established in accordance with § 2468.4 of the District's Personnel Manual. *See Johnson v. Department of the Interior*, 21 M.S.P.R. 316 (1984).

 We also agree with the District that Mr. King's competitive level must be based on his official position of record.[7] In interpreting its comparable competitive level regulation, the federal government has taken the position, consistently, that the competitive level is based on an employee's official position description. The fact that an employee may have been detailed to a different position at the time of his or her RIF does not change the fact that the establishment of the employee's competitive level is based on the official position description. As the Merit Systems Protection Board stated in *Griffin v. Department of the Navy*, 64 M.S.P.R. 561 (1994):

> An employee's competitive level in a RIF is based on his official position of record. *See Estrin v. Social Security Administration*, 24 M.S.P.R. 303, 305 (1984). When an employee is detailed to or acting in a position, his competitive level is determined by his permanent position, and not the one to which he is detailed or in which he is acting. *See Bjerke v. Department of Education*, 25 M.S.P.R. 310 (1984) (details); *Mello v. Department of Energy*, 20 M.S.P.R. 45 (1984) (acting).

*Id.*, 64 M.S.P.R. at 563, 1994 MSPB LEXIS 1388 at 3–4.

Having determined that the official position description is the threshold basis for the establishment of Mr. King's competitive level, we focus now on how the official position description is to be interpreted. Under § 2468.4 of the District's Personnel Manual, all positions "in the same pay system, grade or class, and series which are outside existing collective bargaining units" may comprise a competitive level. Thus, all of the special assistant positions within the DPAH could comprise a competitive level, provided that:

> [they] are sufficiently alike in qualification requirements, duties, responsibilities, and working conditions so that the incumbent in any one (1) position could perform successfully the duties and responsibilities of any of the other positions, without any loss of productivity beyond that normally expected in the orientation of any new but fully qualified employee.

Mr. King maintains that: "the [Chief Administrative Judge] made a specific finding that Ms. Smith's [the District's expert's] interpretation of the [position description] ... [was] not supported by any facts in the record." Instead of relying upon Ms. Smith's interpretation of the special assistant position descriptions, the Chief Administrative Judge based his decision on the testimony of Ms. Qawiyy, the DPAH's expert who in 1990 was "chief of the Office of Administration and Management [which included the Human Resources Division]

---

7. It appears that Judge Lattimer recognized that his analysis had to be based on the official position descriptions. As he stated: "To determine whether positions are sufficiently alike, the qualifications required by the duties of the positions as set forth in the official position descriptions must be examined."

at the DPAH and functioned as the Associate Director for Administration for the department." In an affidavit summarizing her July 6, 1992 testimony, Ms. Qawiyy, who oversaw the creation of the special assistant positions, stated that:

When we created DPAH, we designed all of the Special Assistant positions (DS–301–14) within the Agency to be interchangeable in functional responsibility, and in fact they were treated as such by Agency management.

Furthermore, she declared:

As to Mr. King's position description, the "federal and local drug enforcement law", "knowledge" was not a significant requirement for the Employee's position. The reference to it as a "selective factor," in the vacancy announcement, the basis for Mrs. Smith's claim that it was a unique factor justifying including Mr. King's job in a separate competitive level, was done by the [District of Columbia Office of Personnel] without my knowledge, intent, consent or approval. Such "knowledge" was not an important aspect of the job, however, and its inclusion in the job design did not depart from our objective by diminishing the job's interchangeability with the other Special Assistant jobs for purposes of creating a RIF competitive level, agency management or designation as a "selective factor" in the vacancy announcement.

Indeed, unlike the vacancy announcement, other knowledge factors were listed in the official position description before the one pertaining to federal and local drug enforcement knowledge.

At the December 18, 1996 hearing, which was designed to recreate the 1992 hearing in Mr. King's case, Ms. Qawiyy asserted that, to her knowledge, "DPAH never identified selective placement factors." Furthermore, the special assistant positions "were almost identical in terms of the nature of the work. As a matter of fact some of them were identical in terms of the duties." Ms. Qawiyy agreed that

the special assistant positions at the DPAH were "substantially interchangeable"—that is, "anyone of the special assistants could step into the other special assistant[']s position .... without a loss of productivity beyond that normally expected in the orientation of a new but fully qualified employee." As Ms. Qawiyy put it:

You could move a person from a special assistant position in one office to the special assistant in another office if you wanted to. The nature of the work may be different but the job function would be essentially the same in terms of the role of that person in that particular office.

Ms. Qawiyy summarized her analysis of the duties and skills for twenty-one DPAH special assistant positions. Positions "one through eight and [nineteen] through [twenty-one] are all interchangeable ... with Mr. King's position." She also testified that one of the positions, that was then occupied by Kyla Williams, which had seventeen similar components with the position held by Mr. King, was "100% compatible with Mr. King's position." Thus, Ms. Qawiyy's review of the DPAH special assistant official position descriptions revealed that:

[T]he incumbent in any one (1) position could perform successfully the duties and responsibilities of any of the other positions, without any loss of productivity beyond that normally expected in the orientation of any new but fully qualified employee.

District of Columbia Personnel Manual, § 2468.4.

Although the District's expert, Ms. Smith, testified that the special assistant positions were not interchangeable, and that Mr. King's position, unlike the others, included knowledge of drug laws as a unique selective factor, her testimony was discredited by Judge Lattimer as "totally devoid of substance, or any indicia of reliability." Moreover, even

though the District was offered the opportunity to present a fact witness, and could have established why and how the DCOP included the selective factor of "thorough knowledge of federal and District of Columbia drug enforcement laws, regulations and guidelines" in the vacancy announcement for Mr. King's position, it failed to do so. Consequently, Judge Lattimer had no basis for discounting the factual and interpretive testimony of Ms. Qawiyy.

▪ Accordingly, based upon our review of the record before us, we see no reason to disturb Judge Milliken's determination that:

> [I]n reviewing the TAP judge's ruling, [the OEA] did not find that the Initial Decision was erroneous as a matter of law, nor that it was not supported by substantial evidence in the record as a whole. It appears that the OEA judge simply did not agree with the TAP judge's evidentiary findings and conclusion. Absent a showing that the decision was clearly erroneous or not supported by the entire record, the Initial Decision should stand (*See O'Donnell v. Department of the Army*, 11 MSPB 378, 13 M.S.P.R. 104 (1982); *Holliday v. Department of the Army*, 11 MSPB 14, 12 M.S.P.R. 358 (1982); and *Estrin, supra*). [The District's] argument is insufficient to overturn the TAP judge's ruling.

Disagreement is not a basis for rejecting factual findings and credibility determinations made by the administrative law judge. "An agency 'may not reject an . . . examiner's findings of disputed fact based on the resolution of witness credibility unless the examiner's findings are unsupported by substantial evidence." *Frost, supra*, 638 A.2d at 661 (quoting *Gunty, supra*, 524 A.2d at 1197–98).

▪ Given Ms. Qawiyy's testimony, which Judge Lattimer credited, and his discrediting of Ms. Smith's testimony, we are unable to conclude that Mr. King's official position description "require[d] dif-

ferent and greater skills and training [than the other special assistant positions in the DPAH], justi[fying] [a] separate competitive level[ ]." *Holliday, supra*, 12 M.S.P.R. at 362, 1982 MSPB LEXIS 842 at 5–6. *See also Griffin, supra*, 64 M.S.P.R. at 564–65, 1994 MSPB LEXIS 1388 at 7 ("the agency failed to prove that it properly constructed the competitive level, or that its error did not adversely affect the [employee's] substantive entitlements"). Since "an employee's entitlement under RIF regulations is a substantive right and not a procedural right subject to the harmful error standard," *Johnson, supra*, 21 M.S.P.R. at 318, 1984 MSPB LEXIS 1802 at 2 (other citations omitted), he was improperly denied his right to one round of competition with respect to the positions in his competitive level.

Accordingly, for the foregoing reasons, we affirm the decision of the Superior Court.

*So ordered.*